**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

| | |
|---|---|
| **QR SPEX, INC.,** | |
| **Plaintiff,** | |
| **vs.** | **Case No. 5:06-CV-124 (DF)** |
| **MOTOROLA, INC., OAKLEY, INC., OAKLEY SALES CORP., OAKLEY DIRECT, INC., ZEAL OPTICS, INC., XONIX ELECTRONIC CO., LTD., and KYOCERA WIRELESS CORP.,** | **REQUEST FOR ORAL ARGUMENT** |
| **Defendants.** | |

**JOINT MOTION OF OAKLEY, INC., OAKLEY DIRECT, INC., OAKLEY SALES CORP., AND MOTOROLA, INC. TO: (1) DISMISS OAKLEY, INC. AND OAKLEY DIRECT, INC. FOR LACK OF PERSONAL JURISDICTION, AND (2) DISMISS OAKLEY, INC., OAKLEY DIRECT, INC., AND OAKLEY SALES CORP. FOR IMPROPER VENUE OR ALTERNATIVELY, AND (3) SEVER THE CLAIM AGAINST MOTOROLA, INC. AND OAKLEY, INC., OAKLEY DIRECT, INC., AND OAKLEY SALES CORP. AND TRANSFER THE CLAIM AGAINST MOTOROLA, INC. AND OAKLEY, INC., OAKLEY DIRECT, INC., AND OAKLEY SALES CORP. UNDER § 1404(a), AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW  Defendants Motorola, Inc. ("Motorola") and Oakley, Inc. ("Oakley"), Oakley Direct, Inc. ("ODI"), and Oakley Sales Corp. ("OSC"), hereby move the Court to dismiss Plaintiff QR Spex, Inc.'s ("QR Spex") Complaint for patent infringement under Fed. R. Civ. P. 12(b), or to transfer the action to the Central District of California under 28 U.S.C. § 1404(a) where another action is pending related to this matter, and/or to sever.  Defendants Oakley and Motorola previously filed a motion to dismiss, transfer, and/or sever.  However, Plaintiff recently filed a First Amended Complaint rendering the previous motion moot.

1

1.      Defendants Oakley and ODI move that they be dismissed for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), as they are not subject to either general or specific jurisdiction in this matter, or under the stream of commerce theory.

2.      Oakley, ODI, and OSC move to dismiss the claim against them for improper venue under Fed. R. Civ. P. 12(b)(3), as none of them "reside" in the Eastern District of Texas under 28 U.S.C. § 1391(c).

3.      Alternatively, ODI and OSC move that the Court stay this action pending resolution of a first-filed suit in California, or transfer the claim against them to the Central District of California for consolidation with the earlier filed suit.

4.      Alternatively, Oakley, ODI, and OSC and Motorola move the Court to transfer this action under 28 U.S.C. § 1404(a) to the Central District of California for the convenience of the witnesses and in lieu of a declaratory relief action pending there related to the patent-in-suit.

5.      Finally, Oakley, ODI, and OSC and Motorola move the Court to sever the claim against them under Fed. R. Civ. P. 21 either for purposes of transfer, or alternatively, for purposes of trial if the Court denies all the other motions, because there is no relation between the accused Oakley/Motorola product and any of the other Defendants or their products, marketing, or sales.

6.      This motion is based upon this motion, including the accompanying memorandum of points and authorities, any reply memorandum of points and authorities to be submitted in support of this motion in the future, and upon the declarations of Gregory K. Nelson (Exhibit "A"), Link Newcomb (Exhibit "B"), Scott Olivet (Exhibit "C"), Stuart Shanus (Exhibit "D"), Thomas Miller (Exhibit "E"), and Paul Lehmann (Exhibit "F") submitted herewith, along with their attached exhibits, as well as upon any oral argument the Court may hear as part of this Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

7.    This action should never have been filed in this Court when it was.  At the time this action was filed, the accused product – the Oakley/Motorola O Rokr – was not available for sale. Even at this time, Plaintiff is in such a jurisdictional quagmire that it seems procedurally unprepared to proceed against Oakley, ODI, and OSC and Motorola.  To maintain this action in this district against Oakley, ODI, and OSC and Motorola would only serve to validate QR Spex's repeated misapplication of the law.

8.    As to Oakley, ODI, and OSC, jurisdiction and venue are a façade.  The O Rokr was not made in Texas, and has not been used, sold, or offered for sale in Texas by any of them. Oakley and ODI unquestionably have no presence in Texas.  OSC does business at seven retail locations in Texas, but has absolutely no presence in the Eastern District of Texas. QR Spex is going to improperly conjure an illusion that the stream of commerce supports general jurisdiction over all three Oakley Defendants.  This illusion is unsustainable however in the face of stalwart case law that requires that accused product make its way into the forum, which has not and will not occur through any of Oakley's, ODI's, and OSC's channels.

9.    Three weeks ago, ODI and OSC filed a declaratory relief action in the Central District of California, where QR Spex previously sued Motorola for trade secret misappropriation related to Bluetooth® enabled eyewear.  In response, QR Spex waited seventeen days, or a month after being aware of these companies' business before fling the Amended Complaint in this action, while also filing a lengthy opposition.  The claim against Oakley, ODI, and OSC and Motorola should be severed and transferred to the Central District of California where another action is pending (an earlier action as to ODI and OSC).  No prejudice will occur in doing so, as none of the parties and no potential witnesses are located in this district or even the State of Texas.  On the other hand, QR Spex has already presented evidence related to obviousness and the scope of at least independent claim 1 of the patent-in-suit in the Central District of California.

## II.    BACKGROUND

A.    **The Parties.**

(1)    **Oakley, Inc.**

10.    Oakley is a Washington corporation with its principal place of business located in Foothill Ranch, California, within the Central District of California.  Oakley has done business in Orange County, California since its inception in 1975.  (Exhibit B, ¶ 3)  Oakley products are sold at retail across the nation, but Oakley does not sell those products anywhere other than California.  Specifically, Oakley sells no products in Texas.  (Exhibit B, ¶ 5; Exhibit C, ¶ 6)

11.    Oakley is also a holding company of some subsidiaries.  Oakley owns 100% of the stock in ODI, OSC and Iacon.  ODI and OSC were incorporated in the last several years.  (Exhibit B, ¶¶ 6, 12)  Oakley acquired Iacon in 2001.  (Exhibit B, ¶ 20) Oakley has ten officers and nine directors.  Three officers and one director have responsibilities with ODI and OSC, while one officer and two directors have responsibilities with Iacon as well.  (Exhibit B, ¶¶ 6, 14, 21) Oakley pays consolidated federal and California taxes with its subsidiaries. (Exhibit B, ¶ 5)

12.    Oakley sells its products to a limited number of entities: (1) ODI, which maintains the website, www.oakley.com, and engages in telesales; (2) OSC, which distributes the product to retailers across the country and in "O Stores"; and (3) international subsidiaries and distributors.  All these sales are transacted, performed, and delivered in Foothill Ranch, California.  (Exhibit C, ¶ 6) No consumer transacts any business with Oakley.

13.    Oakley owns no property or assets in Texas.  Oakley has no bank accounts in Texas and pays no taxes in Texas.  Oakley has no offices, management, or employees in Texas, and makes no business decisions in Texas. (Exhibit B, ¶ 4-5) Oakley's outside sales force are all independent contractors and hired by OSC, not Oakley.  (Exhibit B, ¶ 8)  Oakley, Inc., simply put, has no presence in Texas or the Eastern District of Texas.

(2)     **Oakley Direct, Inc.**

14.     Essentially, ODI is responsible for the presentation and sales of Oakley® products directly to consumers.  ODI is a Washington corporation with its principal place of business located in Foothill Ranch, California, within the Central District of California.  ODI owns, maintains, and operates the official Oakley® website, www.oakley.com, and telesales of Oakley® product.  (Exhibit B, ¶¶ 14-15)  For example, if a consumer in Texas were to purchase Oakley product on the Internet or by telephone, the transaction would be with ODI, not Oakley, Inc.

15.     ODI rents separate office space from Oakley.  ODI has its own employees, its own bank accounts, its own records and financing, and its own corporate entity.  ODI pays its own salaries and expenses.  ODI observes all corporate formalities, including book keeping, records, and holding its own board, officer, and management meetings.  ODI's daily operations are kept separate from Oakley.  Three of the four ODI officers are also officers of ODI, and one of the three directors of ODI is a director of Oakley. ODI pays no taxes in Texas; it pays California and federal taxes, in a consolidated format with Oakley.  (Exhibit B, ¶¶ 13-14)

16.     When a consumer makes a purchase of product from www.oakley.com or from telesales they contact ODI in California. (Exhibit B, ¶ 13) The transaction clearly indicates that the purchase is with Oakley Direct, Inc.  (Id.) The sale is performed and completed in California, and the product is shipped F.O.B. California.  (Id.) Specifically, ODI places orders for Oakley product with Oakley.  (Exhibit B, ¶ 15) Title in the product is transferred to ODI, and ODI owns the product.  (Id.) ODI pays Oakley a handling fee to have Oakley employees package and ship product for ODI, which is shipped on behalf of ODI as F.O.B. California to the consumer.  (Id.)

(3)     **Oakley Sales Corp.**

17.     Oakley Sales Corp. functions as a nationwide sales company.  OSC sells Oakley®, Fox®, and other eyewear in a wholesale fashion and also sells at retail in "O Stores."

(Exhibit B, ¶ 9) OSC is a Washington corporation with its principal place of business located in Foothill Ranch, California, within the Central District of California.  (Exhibit B, ¶ 6) OSC rents office space from Oakley, has its own employees, and operates its own business on a daily basis, and otherwise maintains all corporate formalities, including book keeping, records, and holding its own board, officer, and management meetings.  (Id.) OSC maintains its own bank account, and pays its salaries and expenses.  (Id.) Three of the four OSC officers are also officers of Oakley, and one of the three directors of OSC is a director of Oakley. (Exhibit B, ¶ 6)

18.     OSC wholesales Oakley®, Fox®, and other eyewear to retailers across the country. (Exhibit B, ¶ 9) As for Oakley® products, all authorized retail accounts selling Oakley® product are parties to a "Retail Sales Standards Agreement" ("RSSA").  (Id.) The RSSA governs the sales of Oakley® products to retail accounts. Among other things, this agreement acknowledges that the contract is governed by California law and to be performed in California.  (Id.) Prior to the incorporation of OSC, all RSSA's were between Oakley, Inc. and the retailers. (Id.) Upon incorporation of OSC, all RSSA's were assigned to OSC and all new or renewed RSSA's were between OSC and the retailers.  (Id.)

19.     The sales force for OSC is composed of an in-house sales team and outside, independent contractors.  (Exhibit B, ¶ 8) OSC hires independent contractors across the country to interact with, educate, and sell product to retailers.  (Id.) All independent sales representatives sign a contract with OSC, which is also governed by California law and performed in California.  (Id.) OSC has hired four independent contractors in Texas. (Id.)

20.     Sales of Oakley® product to retailers occurs in one of two ways.  The first is that the retailers contact OSC's in-house sales team – typically by fax or telephone – and places an order.  Alternatively, the independent sales representatives receive orders in the field and forwards those to OSC.  (Exhibit B, ¶ 9) In either case, in response to orders and forecasts, OSC places orders with Oakley for product, which is delivered to OSC in Foothill Ranch, California or Ontario, California.  (Id.) OSC then pays Oakley a fee to pack and ship these

products to retailers on its behalf. (Exhibit B, ¶¶ 6, 9)  This fee is a negotiated, arm's length cost.  (Exhibit B, ¶ 6)

21.     The other side of OSC is that it employs sales staff for "O Stores" across the country. O Stores are retail locations highlighting the sale of Oakley® product. There are six "O Stores" and one "Vault" location in Texas.  OSC employs the staff at each of these locations. As such, OSC pays state taxes in Texas, but none are located in the Eastern District of Texas as well as all other states where it does business.  (Exhibit B, ¶ 7)

(4)     **Iacon, Inc.**

22.     Iacon is a company that Oakley acquired in 2001.  (Exhibit B, ¶ 20) Iacon is a multi-brand retail front selling under multiple brand names across the country. (Id.)  Iacon is a Texas corporation, with its principal place of business located in Scottsdale, Arizona.  (Id.) Iacon sells numerous eyeglass brands and accessories.  (Id.)

23.     Iacon operates as a separate company and maintains all corporate formalities. (Exhibit B, ¶ 21) It pays its own salaries and expenses.  (Id.) It holds its own board, officer, and management meetings.  (Id.) It makes its own business decisions.  (Id.) It interacts with, negotiates, and purchases from numerous companies across the country.  (Exhibit B, ¶ 20) Two of its board members are members of Oakley's board, and one of its four officers is an officer of Oakley.  (Exhibit B, ¶ 21) Iacon has 23 locations in Texas.  (Exhibit B, ¶ 20)

(5)     **Motorola, Inc.**

24.     Motorola is a global leader and innovator in wireless and broadband communications, and Fortune 100 company.  Motorola is a Delaware corporation, with its principal place of business located in Schaumburg, Illinois.  (Exhibit E, ¶ 4) Motorola is registered to do business in Texas and has a registered agent here.  Motorola supplies the Bluetooth® component for the O Rokr, which it ships to a vendor for final assembly with the frame supplied by Oakley.  (Exhibit E, ¶ 5) Motorola will then purchase final O Rokr product from the vendor. (Id.)  In the near future, Motorola will begin selling the O Rokr, but only on its website.  (Exhibit E, ¶ 6)  When it does begin selling on its website, Motorola will also prohibit sales of the O Rokr in Texas.  (Id.)

(6)    **QR Spex, Inc.**

25.    QR Spex is an Oklahoma corporation, which its principal place of business located in Tulsa, Oklahoma.  Defendants are not aware that QR Spex is actually making or selling any product, but QR Spex is the purported owner, by assignment, of the patent-in-suit.  QR Spex has a familiarity to both Motorola and Oakley.

26.    In 2000, the owner of QR Spex discussed developing a Bluetooth eyewear with a company in California called Frog Design.  Subsequently, Frog Design did not do the project with QR Spex, but moved on to a project with Motorola.  After learning of this joint venture, QR Spex sued Frog and Motorola in the Central District of California for, among other things, trade secret misappropriation stemming from the patent application that issued as the present patent-in-suit.  (Exhibit A, Ex. 1; Exhibit D ¶ 4)

27.    The Central District of California became very involved in the case, even reading and reviewing expert testimony on prior art and the state of the art as it related to the obviousness of Bluetooth eyewear.  (Exhibit D, ¶ ¶ 6-7)  In a summary judgment ruling, after reading deposition testimony and expert statements, the Court found there was no protected trade secret because of the publication of the pending patent application that issued as the '767 patent-in-suit.  The Court believed that Bluetooth eyewear was obvious and the claims of this patent must be narrowly construed.  (Exhibit D, ¶ 6) The matter illustrates that QR Spex not only finds that forum convenient, but also argued issues regarding the obviousness and scope of the substance of this patent in the Central District of California against Motorola.  (Exhibit A, Ex. 3)

28.    QR Spex also attempted to do business with Oakley.  In the summer of 2001, QR Spex approached Oakley about jointly developing Bluetooth enabled eyewear.  Oakley was already in the process of developing its own technology for Bluetooth enabled eyewear, but was willing to listen to QR Spex about whether they had better ideas about how to functionally do the project.  (Exhibit B, ¶ 14)  After Oakley and QR Spex signed a Non-Disclosure Agreement to govern their tentative arrangement at that time, the parties got down

to examining each other's ideas.  (Exhibit B, Ex. 2) The NDA not only was governed by California law, but provided for exclusive jurisdiction in Orange County, California.  (Id.)

29.     Oakley started looking at QR Spex's patent publication and disclosure.  In doing so, Oakley found that there was serious prior art concerns, severe limitations about the applicability of the patent, and concessions made in prosecution before the USPTO that made the patent rather useless.  (Exhibit B, ¶ 23)  Accordingly, Oakley determined to not do a project with QR Spex, but to continue down its own path.  A couple years later, QR Spex again approached Oakley in California and wanted to renew discussions with Oakley, signed a new NDA (Exhibit B, Ex. 4), but again Oakley was not interested.  Apparently, QR Spex wants to use litigation as a weapon to extract a license it could not get legitimately.

B.     **The Accused Product and The Oakley Channels.**

30.     Oakley and Motorola jointly developed a Bluetooth enabled sunglass, which they released last year, called the "Razrwire".[1]  With success on that product, Oakley and Motorola undertook the development of the latest project, the "O Rokr," which is a Bluetooth enabled sunglass that allows the wearer to hear streaming audio in stereo, such as from your iPod, as well as to talk on the cell phone.  (Exhibit C, ¶ 3)  Oakley and Motorola hoped to have the product on the market earlier in the year, but manufacturing delays resulted in its delayed release in the third quarter of the year.  (Exhibit C, ¶ 4)  In fact, the product just began its initial release. (*Id.*)

31.     Oakley and Motorola jointly developed the O Rokr. Oakley primarily designed the eyewear and the carrying of the Bluetooth® unit, while Motorola designed the Bluetooth® chip, circuitry and other electronics.  (*Id.*) Oakley sells the eyeglass frame to a vendor in Singapore, and Motorola sells the Bluetooth® and electronics to the same vendor.  (*Id.*) The vendor then assembles the finished product and resells the product to Oakley and Motorola.

---

[1] Plaintiff does not accuse this product of infringing its patent.  (Exhibit A, ¶10)

(*Id*.) Oakley and Motorola make separate purchases of the product from the vendor in Singapore and sell the product in their own channels. (*Id*.)

32.     Prior to the release of the O Rokr, Oakley, ODI, and OSC had "Engineering Samples" of the product, which were clearly marked as such.  Engineering samples were sent to O Stores and the independent sales representatives across the country. (Exhibit B, ¶ 10) The purpose was for their education, review, and amusement.   (Id.) They were given the opportunity to see the new product and test its performance.  (Id.) As these individuals are familiar with not only Oakley® product but consumers, their input is helpful as to whether the product will meet the demands of Oakley consumers.   (Id.) Additionally, these individuals have a chance to play around with the product for their individual amusement. (Id.) However, the product is specifically not for resale.  (Id.) Ten samples were sent to Texas.  (Id.) All ten were returned to OSC in June, which is customary given that the stores and sales representatives prefer to have finished product when it is available. (Id.)

33.     ODI had a listing for the O Rokr on the Oakley website in May.  This listing was down by at least May 31, 2006.  (Exhibit B., ¶ 16) The listing provided information about the product and instructed individuals to contact telesales to place a pre-order, if they so desired, but had no anticipated delivery date.  (Id.) It is undisputed that no Texas resident placed any pre-order for the O Rokr during this time.  (Exhibit B, ¶ 17) There is no evidence that any bona fide purchaser from Texas even viewed this link on the website during this period of time.   (Id.) When the link was reposted around the weekend of July 1, 2006, the link specifically indicated that the O Rokr would not be available for purchase in Texas. (Id.)

34.     The independent sales representatives began to take pre-orders for the O Rokr in May, as well.  However, it is undisputed that no pre-orders were in Texas.  (Exhibit B, ¶ 10; Exhibit C, ¶ 8)

35.     In some O Stores across the country, consumers were able to see images of the O Rokr and put their names on waiting lists for call backs when and if the product became available.  There are no waiting lists for the O Rokr in Texas.  (Exhibit B, ¶11)

C.       **Procedural Background.**

36.      This action was filed on June 8, 2006 by QR Spex.  On June 30, 2006, Oakley and Motorola filed a joint motion to dismiss and/or transfer the matter to the Central District of California.  QR Spex filed a detailed opposition to this motion on July 21, 2006, after conducting jurisdictional discovery and taking Oakley's deposition on July 11, 2006.

37.      In the interim, on July 10, 2006, ODI and OSC filed a lawsuit against QR Spex in the Central District of California (the "California Action") for unfair competition and declaratory judgment of non-infringement and invalidity of the patent-in-suit.  The California Action was filed in the Central District of California because that is where ODI and OSC are headquartered, where they take delivery of the accused product, and from where they sell the accused product.  (Exhibit B, ¶ 27)  On or about August 7, 2006, QR Spex filed an answer in the California Action.

38.      Probably in reaction to the California Action being filed, though in lengthy delay, on July 27, 2006, QR Spex filed a First Amended Complaint in the present action whereby it added ODI and OSC as Defendants. In light of the filing of the amended complaint, Oakley's and Motorola's previous motion to dismiss or transfer was rendered moot.

## III.     DISCUSSION

A.       **There Is No Personal Jurisdiction Over Oakley, Inc. or Oakley Direct, Inc.**

39.      The First Amended Complaint in this action is the first reference point for jurisdiction over Oakley and ODI.  In essence, QR Spex contends that Oakley and ODI may be subject to general jurisdiction, specific personal jurisdiction, or jurisdiction under the stream of commerce theory.  Plaintiff cannot satisfy its burden under any of the theories.

### 1.   **Relevant standards for personal jurisdiction.**

40.      As this is a patent infringement case, the Court must apply the law of the Federal Circuit in weighing personal jurisdiction.  See Rates Tech., Inc. v. Nortel Networks Corp., 399 F. 3d 1302, 1307 (Fed. Cir. 2005), citing Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc., 148 F. 3d 1355, 1358 (Fed. Cir. 1998).  The Court first looks to the forum state's jurisdictional statute, and then to the requirements of the Due Process clause, as both must be satisfied.  See Genetic Implant Sys., Inc. v. Core-Vent Corp., 123 F. 3d 1455, 1458 (Fed. Cir.

1997).  Where the Texas long arm statute is co-extensive with the limits of due process provided by the U.S. Constitution, Tex. Civ. Prac. & Rem. Code Ann. §§ 17.042-043, jurisdiction is appropriate if the "defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into Court there."  World-Wide Volkswagen Corp. v. Woodson, (1980) 444 U.S. 286, 297.

41.    The constitutional exercise of jurisdiction requires that a defendant must have "purposefully availed [itself] of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws."  Hanson v. Denckla, 357 U.S. 235, 253 (1959).  Jurisdiction is typically established as either "general" or "specific" jurisdiction. General jurisdiction allows the exercise of jurisdiction over a defendant with "continuous and systematic" contacts with the forum state for any cause of action, even if it has no direct relation to the contacts.  See Helicopteros Nacionales de Colombia S.A. v. Hall, 466 U.S. 408, 414-416 (1984).  Specific jurisdiction only exists when the cause of action "arises out of" or "relates to" the contacts with the given forum and is reasonable.  See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-73 (1985).  Alternatively, in cases where accused product is on sale in the forum, but reached there only by a defendant placing the product into the stream of commerce rather than directly selling there, jurisdiction may also be proper.  See Viam Corp. v. Iowa Export-Import Trading Co., 84 F. 3d 424, 427 (Fed. Cir. 1996).

42.    Where the defendants contest the Court's exercise of personal jurisdiction, the plaintiff bears the burden of setting forth a *prima facie* showing that the exercise of jurisdiction is proper.  See Mink v. AAAA Dev. LLC, 190 F. 3d 333, 335 (5th Cir. 1999). The Court need not "credit conclusory allegations, even if uncontroverted," but should look at the facts concerning the defendant's contacts.  Panda Brandywine Corp. v. Potomac Elect. Power Co.," 253 F. 3d 865, 868-69 (5th Cir. 2001) ("Establishing a *prima facie* case still requires the plaintiff to show the non-resident defendant's purposeful availment of the benefits and protections of and minimum contacts with the forum state.").  Where jurisdictional discovery has taken place, and the facts appear undisputed, QR Spex has the

burden to demonstrate by a preponderance of the evidence that Oakley and ODI have sufficient contacts to merit the exercise of jurisdiction. See <u>Pieczenik v. Dyax Corp.</u>, 265 F. 3d 1329, 1334 (Fed. Cir. 2001).

> 2. **<u>The stream of commerce theory does not support jurisdiction over Oakley or ODI where no accused product was sold in the forum.</u>**

43.    As neither Oakley nor ODI directly sell products in Texas, QR Spex will likely argue that both are subject to jurisdiction under a "stream of commerce" theory. The stream of commerce is a commercial reality-check for jurisdiction that courts employ in limited situations, as an alternative to the typical general or specific jurisdiction discussion where accused product reaches the forum indirectly but knowingly from the defendant. <u>See</u> <u>Viam</u>, 84 F. 3d at 427 .[2]    Where the O Rokr product has not been placed into the stream of commerce such that it will arrive in Texas, this theory is inapplicable.

44.    Both the Supreme Court and Federal Circuit have clearly limited the stream of commerce theory to situations where accused product reaches the forum. In reality, the stream of commerce theory really functions to support specific jurisdiction where the defendant did not directly sell the accused product in the forum. A brief review of the evolution of the stream of commerce theory is useful in setting the context for its limited use. The stream of commerce theory was first discussed by the Supreme Court in <u>World Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 297 (1980), where the Court recognized that jurisdiction may exist in situations where sales "arise[] from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for ***the product***" in the forum. <u>Id.</u> (emphasis added); <u>Moore v. Harney Hardware, Inc.</u>, 2006 WL 1342820, n.2 (S.D. Tex., May 15, 2006) (Plaintiff did not need to rely on the stream of commerce to support specific jurisdiction, "given that [defendant] is alleged to have sold its products ***directly*** to a Texas

---

[2] "Although [the general versus specific jurisdiction] distinction may be analytically helpful in some situations, but is not useful here. The analytical tool useful in cases in which the Defendant's contacts are the result of establishing a distribution network in the forum State for the sale of Defendant's products is generally referred to as the 'stream of commerce' theory." <u>Viam</u>, 84 F. 3d at 427.

company, ***rather than indirectly*** through a distribution channel") (emphasis added). Without further explanation, the issue really did not gain momentum until the Supreme Court's ruling in <u>Asahi Metal Indus. Co. v. Sup. Ct.</u>, 480 U.S. 102 (1987).

45.     The <u>Asahi</u> Court recognized the stream of commerce as a viable basis for jurisdiction, but was split on the issue of what represented sufficient minimum contacts under this theory. Justice O'Connor wrote for the plurality that the "mere act of placing the product into the stream" of commerce was not sufficient, but required "[a]dditional conduct of the defendant to indicate an intent or purpose to serve the market in the forum state." <u>See id.</u> at 112. Justice Brennan, joined by three others, wrote that additional conduct was needed where the defendant put the goods into "the regular and anticipated flow of products from manufacture to distribution to retail sale." <u>See id.</u> at 117.

46.     Picking up where the Supreme Court left off, the Federal Circuit has applied this doctrine, but not resolved the split, in cases where accused product has entered the stream of commerce and arrived in the forum state. In <u>Beverly Hills Fan Co., v. Royal Sovereign Corp.</u>, the Federal Circuit sounded in specific jurisdiction when it held that the stream of commerce theory would satisfy due process where the accused product was sold in the forum state after the defendant shipped the accused product through an established distribution channel and ***"[t]he cause of action for patent infringement is alleged to arise out of these activities."*** 21 F.3d 1558, 1565 (Fed. Cir. 1994) (emphasis added); <u>accord</u> <u>Akro Corp. v. Luker</u>, 45 F. 3d 1541, 1545 (Fed. Cir. 1995) (in applying the stream of commerce theory the Court looked to whether the defendant/patentee "purposefully directed his activities at residents of [the forum] and, if so, whether the litigation results from alleged injuries that arise out of or relate to those activities"). In contrast with this case, the exercise of jurisdiction was proper in <u>Beverly Hills</u> because "defendants, acting in consort, placed the ***accused [product]*** in the stream of commerce, they knew the likely destination of the products, and their conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there." <u>Id.</u> at 1566.

47.     Subsequently, the Federal Circuit reemphasized that the stream of commerce theory is its own species for jurisdiction.  See Viam, 84 F. 3d at 427.   Also in contrast with the present case, in applying the theory, the Court found that jurisdiction was properly exercised over a foreign defendant in a declaratory relief action that sold product protected by the contested patent in the forum through a regular chain of distribution.  See id. at 429.  Last year, the Federal Circuit affirmed the vitality of the stream of commerce theory, again, where accused product was sold by a foreign defendant indirectly through its channels of distribution which reached the forum state.   See Commissariat A L'Engergie Atomique v. Chi Mei Optoelectronics Corp., 395 F. 3d 1315, 1322 (Fed. Cir. 2005).

48.     The district courts have consistently followed the precedent of the U.S. Supreme Court and Federal Circuit, only finding jurisdiction under this theory over non-resident defendants when the accused product was placed in the stream of commerce and directed to the forum state where sales of the accused product occurred.   See, e.g., Kernius v. International Electronics, Inc., 2006 WL 1689761 at *45 (D. Md., June 7, 2006) (exercise of jurisdiction proper under stream of commerce theory where accused product was sold to national accounts that sold in the forum); Ideal Instruments, Inc. v. Rivard Instruments, Inc., 2006 WL 1217201 at *9-10 (N.D. Iowa, May 8, 2006) (stream of commerce theory supported specific jurisdiction because accused product was on sale in forum through local distributor); Telemac Corp. v. Phonetec LP, 2005 WL 701605 (N.D. Cal., March 25, 2005) (specific jurisdiction supported by sale of accused product in forum through stream of commerce and link to distributor's interactive website from the defendant's website).

49.     The stream of commerce theory cannot be applied to this case because the accused product has not made its way to Texas through Oakley or ODI's channels of distribution.  It is undisputed that the O Rokr is not on sale in Texas and has not been sold in Texas.  Where no accused product has been sold or is expected to be sold in Texas through Oakley's or ODI's channels, the stream of commerce is not a relevant query, and the claim against them should be dismissed for lack of personal jurisdiction.

### 3. **Neither Oakley nor ODI are present in the forum in any manner that would confer general jurisdiction.**

50.    General jurisdiction may only be found where a defendant's "contacts with a forum are 'continuous and systematic' … even when the cause of action has no relation to those contacts." Red Wing Shoe Co. v. Hockerson –Halberstadt, Inc., 148 F. 3d 1355, 1359 (Fed. Cir. 1998).  "However, it is clear from the relative scarcity of cases permitting the assertion of general personal jurisdiction over a non-resident corporation that the standard of imposing general jurisdiction is high."  Reynolds & Reynolds Holdings Inc. v. Data Supplies, Inc., 301 F. Supp. 2d 545, 550 (E.D. Vir. 2004).

51.    Oakley has no property, no offices, no bank accounts, no employees, and makes no business decisions in Texas.  (Exhibit B, ¶ ¶ 3-4)  Even though Oakley-branded product is sold in Texas, Oakley does not have the requisite continuous and systematic contacts with Texas that would make it amenable to general jurisdiction in this forum.  These sales, by third parties, only represent approximately 3% of Oakley brand sales last year and approximately 2% this year.  (Exhibit B, ¶ 22)  Such is clearly insufficient to support general jurisdiction over Oakley.

52.    Approximately a decade ago, before ODI and OSC existed, the Southern District of New York considered whether Oakley was subject to general jurisdiction where it sold product to retailers located in New York that resold Oakley product to New York consumers.  In that case, as OSC and ODI in this case, the Oakley sales were completed and transacted in California.   The Court held that Oakley was not subject to general jurisdiction, despite sales to New York retailers constituting approximately 2% of sales of Oakley products.  See Riviera Trading Corp. v. Oakley, Inc., 944 F. Supp. 1150, 1156 (S.D.N.Y. 1996).

53.    The situation is clearly analogous here.  Oakley sells its products to ODI, OSC, Iacon, and international subsidiaries and distributors.  However, all such sales are performed, transacted, and completed in California, and shipped F.O.B. California.  OSC resells Oakley product to retail accounts across the country.  All such sales are governed by a "Retail Sales Standards Agreement", which is governed by California law and to be performed in

California.  OSC also operates "O Store" facilities across the country.  In this capacity, it is functioning as a retailer, having purchased the product from Oakley in California.  Finally, Iacon functions just like any other retailer – it purchases product from Oakley in California and takes delivery F.O.B. California.  All these sales in California ultimately result in sales to individuals in Texas, amounting to just 2-3% of total sales of Oakley product.  General jurisdiction is not warranted as to Oakley.  See id.; see also Stairmaster Sports/Med. Prods., Inc. v. Pacific Fitness Corp., 916 F. Supp. 1049 (W.D. Wash. 1995), aff'd, 78 F. 2d 602 (Fed. Cir. 1996) (no general jurisdiction where shipment of products unrelated to suit represented three percent of total sales).

54.     Moreover, it is black letter law that a subsidiary's acts cannot establish personal jurisdiction over the parent company.  See Phonometrics, Inc. v. Northern Telecom Inc., 133 F. 3d 1459, 1463, 1468 (Fed. Cir. 1998) (no alter ego where parent did not control subsidiary's acts); Kelly v. Syria Shell Petroleum Dev. B.V., 213 F. 3d 841, 856-57 (5th Cir. 2000); Alpine View Co. v. Atlas Copco AB, 205 F. 3d 208, 218-19 (5th Cir. 2000) (so long as the parent and subsidiary maintain separate and distinct corporate entities, the presence of one in the forum is not imputed to the other); Hargrave v. Fibreboard Corp., 710 F. 2d 1154, 1159-60 (5th Cir. 1983); Nutrition Physiology Corp. v. Enviros Ltd., 87 F. Supp. 2d 648, 654-57 (N.D. Tex. 2000) (applying Federal Circuit law and granting motion to dismiss a parent company for lack of personal jurisdiction); American Eyewear, Inc. v. Peeper's Sunglasses & Accessories, Inc., 106 F. Supp. 2d 895, 899 (N.D. Tex. 2000).  There is no evidence that would support piercing the corporate veil, where Oakley and its subsidiaries have maintained all corporate formalities, and the subsidiaries have operated and functioned as separate companies.  Thus, the presence of OSC or Iacon in Texas cannot be attributed to Oakley, a separate corporate entity.

55.     As for ODI, it also has no physical presence in the state of Texas.  ODI is headquartered in Foothill Ranch, California, and only conducts business in Foothill Ranch, California.  ODI has no property, officer, bank accounts, or employees in Texas.  ODI pays no taxes in Texas.  ODI makes no business decisions in Texas.  ODI owns, maintains, and

operates the website www.oakley.com and telesales associated with the website. All sales are transacted in California and shipped F.O.B. California.

56.    Maintenance of a website, even if it were interactive, does not convey general jurisdiction over a non-resident defendant. See Revell v. Lidov, 317 F. 3d 467, 471 (5th Cir. 2002). Indeed, this Court has held that the maintenance of an interactive website is not sufficient to convey general jurisdiction. See J-L Chieftain, Inc. v. Western Skyways, Inc., 351 F. Supp. 2d 587, 593-94 (E.D. Tex. 2004) (maintenance of a website that allowed sales to occur in Texas was not sufficient in conjunction with other traditional contacts to support general jurisdiction); accord ESAB Group, 34 F. Supp. 2d at 330 (interactive website combined with sales in the forum was insufficient for general jurisdiction). Thus, sales by ODI of *non-accused* product over the internet and in this jurisdiction would not be sufficient to establish general jurisdiction over either Oakley or ODI. See id. at 595, citing Helicopteros, 466 U.S. at 418, Burger King, 471 U.S. at 478-79; Bearry v. Beech Aircraft Corp., 818 F. 2d 370, 375-76 (5th Cir. 1987).[3]

57.    Oakley and ODI have the right to structure their sales so that all sales occur outside a particular forum. See, e.g., Riviera Trading, 944 F. Supp. at 1157. This is exactly what they have done, and general jurisdiction does not exist as to either.

    4.    **Where no infringing sale, offer to sell, or use has occurred in Texas, specific jurisdiction cannot vest as to Oakley or ODI.**

58.    Why this action was initiated in this forum is largely speculative, except if we presume that QR Spex is forum shopping for some perceived advantage. See generally Adell Corp. v. Elco Textron, Inc., 51 F. Supp. 2d 752, 755 (N.D. Tex. 1999). Otherwise, this lawsuit has no apparent nexus with the State of Texas, as the accused product has not been sold at all and will not be sold in Texas.

---

[3] In contrast, split authority exists where a Defendant's primary means of conducting business is over an interactive website. See, e.g., Gator.com Corp. v. L.L. Bean, Inc., 341 F. 3d 1072, 1078 (9th Cir. 2003) (millions of dollars of sales coupled with extensive marketing with direct email solicitations and millions of catalog sales supported general jurisdiction).; Gorman v. Ameritrade Holding Corp., 293 F. 3d 506, 513 (D.D.C. 2002).

59.    As detailed above, neither Oakley nor ODI is present in Texas.  Therefore, Plaintiff must show that each has sufficient minimum contacts with this forum related to the cause of action "such that the maintenance of the lawsuit does not offend 'traditional notions of fair play and substantial justice.'"  Akro, 45 F. 3d at 1545, quoting Int'l Shoe, 326 U.S. at 316. Specific jurisdiction exists "when the cause of action at issue 'arises out of or relates to' contacts [with the forum] … even if those contacts are 'isolated and sporadic.'" Red Wing Shoe, 148 F. 3d at 1359.  More specifically, the Federal Circuit test for specific jurisdiction requires the satisfaction of a three-prong test: "(1) whether the defendant purposefully directed its activities at residents of the forum, (2) whether the claims arises out of or relates to those activities, and (3) whether assertion of personal jurisdiction is reasonable and fair." 3D Systems, 160 F. 3d at 1378, citing Akro, 45 F. 3d at 1545-46.

60.    Whether Oakley or ODI have sold non-accused Oakley product in Texas is irrelevant for specific jurisdiction.  The Federal Circuit has clearly held that in cases of patent infringement, to be amenable to jurisdiction, the defendant's alleged infringing activity must take place in the forum state.  See id.; Hollyanne Corp. v. TFT, Inc., 199 F.3d 1304, 1308 (Fed. Cir. 1999).  Thus, any contacts by Oakley or ODI with Texas must arise out of or relate to QR Spex's allegations of infringement by the O Rokr.

61.    "Patent infringement occurs when someone 'without authority makes, uses, offers to sell or sells any patented invention.'"  3D Systems, 160 F. 3d at 1378.  None of these activities have occurred in Texas in any manner associated with Oakley or ODI. Accordingly, there is a lack of minimum contacts with regard to Oakley.

    a) **Oakley and ODI have no minimum contacts with this forum "arising out of" or "related to" the accused infringement.**

62.    Under the patent laws, Oakley and ODI are not making, using, selling, or offering to sell the accused product in Texas.  The accused product is made overseas.  (Exhibit C, ¶ 4) After conducting jurisdictional discovery, there can be no dispute that there have been no sales by Oakley or ODI of the accused product in Texas, and no pre-orders for O Rokr in Texas. Indeed, there is no evidence that any of the accused O Rokr product is available for

purchase anywhere in Texas, despite its general release across the nation.  The only relevant issue as to specific jurisdiction is whether there has been an infringing use or offer for sale occurring at the time the complaint was filed.  <u>See</u> <u>Red Wing Shoe</u>, 148 F. 3d at 1359; <u>Hollyanne</u>, 199 F. 3d at 1308.

(1) <b><u>There is no evidence of sales of the accused product in Texas.</u></b>

63.     Where the accused product will not be sold in the forum, the Court lacks jurisdiction over Oakley.  <u>See</u> <u>Quality Tubing, Inc. v. Precision Tube Holdings Corp.</u>, 75 F. Supp. 2d 613, 621 (S.D. Tex. 1999) (in granting summary judgment of non-infringement, the Court held there can be no infringing activity where no delivery of allegedly infringing product would occur).  Defendant's conclusory allegations that sales are occurring are insufficient in the face of Oakley's evidence that no sales are occurring in Texas.  (Exhibit C, ¶ 8)

64.     In May, Oakley, ODI, and OSC hoped to soon obtain O Rokr for sale in the near future.  In anticipation, ODI posted an O Rokr product page on the website that indicated that consumers could call telesales to pre-order product.  (Exhibit B, ¶ 17) However, there is no evidence that any sales or pre-orders were ever made with Texas residents.  (Exhibit B, ¶¶ 10-11) Moreover, there are no pre-orders whatsoever in Texas.  In sum, no accused O Rokr product has been sold, let alone ordered, in Texas.

65.     Oakley and ODI have no plans to sell the O Rokr in Texas.  When the O Rokr product page was re-introduced on <u>www.oakley.com</u>, the weekend of July 1st, the following appears: **_"This product is not available in Texas or Oklahoma."_** (Exhibit C, Ex. 1)   Oakley has ensured that all in its distribution chain will not sell the O Rokr in Texas.  (Exhibit C, ¶ 5)

66.     Oakley and ODI have the right to avoid jurisdiction in a particular forum by following the advice of the Courts and limiting to whom it will sell the accused products.  As the <u>Zippo</u> Court stated, if Oakley and ODI "had not wanted to be amenable to jurisdiction in [Texas], [they] could have chosen not to sell [its products] to [Texas] residents."  <u>Zippo</u>, 952 F. Supp. at 1126-27; <u>see also</u> <u>Stomp, Inc. v. Neato, LLC</u>, 61 F. Supp. 2d 1074, 1080-81

(C.D. Cal. 1999).[4]  They have done just that and there have been and will be no infringing

sales in Texas that could confer jurisdiction.

> (2) **No infringing offer to sell was occurring at the time the
> lawsuit was filed.**

67.    There is no infringing offer to sell the O Rokr in Texas because no infringing sale will

occur.  Moreover, there was no delivery date fixed to the O Rokr page on the website, and

there is no evidence of a bona fide purchaser even viewing the O Rokr product page on the

internet.  Nothing about the Oakley website, which was down at least a week before QR

Spex filed the lawsuit, would constitute an infringing offer to sell.

68.    Congress set forth that "an 'offer for sale' or an 'offer to sell' by a person other than

the patentee, or any designee of the patentee, *is that in which the sale will occur* before the

expiration of the term of the patent."  35 U.S.C. § 271(i).  No sale of the O Rokr "will occur"

in Texas, so there can be no infringing offer to sell.

69.    If the intent to sell is to not consummate by an allegedly infringing sale in the forum,

then there can also be no infringing "offer to sell."  See Cybiotronics, Ltd. v. Golden Source

Electronics, Ltd., 130 F. Supp. 2d 1152, 1171 (C.D. Cal. 2001).  The Cybiotronic Court

noted that there could be no infringing offer to sell unless that offer to sell contemplates an

infringing sale that would be consummated.  See id. Likewise, after thoroughly reviewing the

Federal Circuit case law regarding an "offer to sell," the Quality Tubing Court granted

summary judgment that there was no infringing offer to sell because there could be no

---

[4]    "It is the merchants who seek to sell their goods only to consumers in a particular
geographic that can control the location of resulting lawsuits.  The owner of a website can
(1) include a disclaimer that it will not sell its products outside a certain geographic area,
and (2) an interactive "clickwrap agreement" that includes a choice of venue clause
which a consumer must agree to before being allowed to purchase any products. . . . But
when a merchant seeks the benefit of engaging in unlimited interstate commerce over the
Internet, it runs the risk of being subject to the process of the Courts of [] those states."
Stomp, 61 F. Supp. 2d at 1079

completed sale for which the offer was made that would arguably constitute infringement. See id. at 624.

70.    Other district Courts have reached similar conclusions in finding no infringing offer to sell where no infringing product was likely to be sold.  See, e.g. Technical Mfg. Corp. v. Integrated Dynamics, Engineering, Inc., 183 F. Supp. 2d 339, 342 (D. Mass. 2002) (negotiation and execution of a contract to sell allegedly infringing product is not an infringing offer unless it would result in an infringing act); Natare Corp. v. Aquatic Renovation Sys., Inc., 99 F. Supp. 2d 986, 991 (S.D. Ind. 2000) (bid to install a pool that did not include an infringing process could not constitute an infringing offer).

71.    Simply put, in the present case, no infringing product will be available or sold in Texas (Exhibit C, ¶ 5), so there can be no contract for an infringing sale to be completed. This situation is specifically excluded from Congress's definition of an infringing offer.

72.    Further, any accusation that the O Rokr page on the Internet was an infringing offer to sell fails for two additional reasons – there was no expected delivery date and there is no evidence of any "offer" communicated to a bona fide purchaser in Texas.

73.    For purposes of an analysis of infringement by an "offer to sell", the courts apply general contract principles.  See 3D Systems, 160 F. 3d at 1379; Rotec Indus., Inc. v. Mitsubishi Corp., 215 F 3d 1246, 1254-55 (Fed. Cir. 2000).  An allegedly infringing offer to sell must be of such a character that "the defendant 'communicate[s] a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corp., 420 F. 3d 1369, 1376 (Fed. Cir. 2005), quoting Rotec, 215 F. 3d at 1255; see also Hollyanne 199 F. 3d at 1309-10 (offer without price quote, delivery date, product description, or availability dates is not an offer to sell).  TransOcean Offshore Deepwater Drilling, Inc. v. Globalsantafe Corp., 400 F. Supp. 2d 998, 1013 (S.D. Tex. 2005) (bid to perform allegedly infringing process was not an infringing offer to sell where the bid included no price that could result in a consummated deal).

74.     Even under contract terms, however, the Oakley website had no binding offer to sell because there was no delivery date.   See Moldflow Corp. v. Simcon, Inc., 296 F. Supp. 2d 34 (D. Mass. 2003) (finding no infringing offer to sell because to be an offer to sell, an offer must create a power of acceptance communicated to an offeree, which did not exist where there was no time of delivery, among other terms).   Oakley and ODI had no anticipated delivery date in May 2006; hence, no delivery date was given with pre-orders, none of which actually occurred in Texas.  (Exhibit C, ¶ 4; Exhibit B, ¶ 16)  Thus, the terms on the website were insufficient under contract law to be a binding offer.

75.     Finally, "[i]n the absence of a communication with a third party, it is difficult to imagine any commercial detriment of the rightful patentee taking place." Rotec, 215 F. 3d at 1255; see also McKeown v. City of Chicago, 2001 WL 59034 at *4 (N.D. Ill., Jan. 19, 2001). It is undisputed that there is no evidence that any bona fide Texas consumer actually viewed that product page on the website.  Where the evidence clearly shows that no pre-orders have been placed from consumers in Texas, there is no evidence, but only supposition, that any Texas resident viewed O Rokr on the Oakley website. See ESAB Group, Inc. v. Centricut, LLC, 34 F. Supp. 2d 232, 233 (D.S.C. 1999) (where there was no evidence of residents actually viewing a purported offer to sell on the internet, there was no offer to sell communicated).   QR Spex's conclusory supposition in its complaint that an infringing offer was communicated in Texas simply lacks merit.

76.     Finally, even if the Court viewed this as an infringing offer, it was not occurring at the time the lawsuit was filed.  This link on the Oakley website was down well before the filing of the lawsuit. (Exhibit B, ¶ 16)  See Klinghoffer v. S.N.C. Achille Lauro, 937 F. 2d 44, 52 (2d Cir. 1991) (if wrongful activity ceased before filing of the lawsuit, then jurisdiction is lacking).  The bottom line is that no infringing offers to sell were being made at the time QR Spex filed the lawsuit.  QR Spex has presented no evidence that infringing offers that would have resulted in infringing sales were made to any Texas resident.  There is no evidence that any pre-orders for O Rokr product were made anywhere in Texas at any time.  Thus, there has clearly been no infringing offer to sell in Texas.

(3) **There has been no infringing use in Texas.**

77.     Finally, there was no infringing use at the time the lawsuit was filed because there is no evidence of use in Texas of the O Rokr in a substantially sales-oriented manner.  The only "use" that QR Spex could pretend to present to the Court would be ten "engineering samples" of the O Rokr sent to Texas and then returned.[5]  However, the law is clear that there must still be a commercial component associated with these activities to constitute an infringing "use."  See Intermedics, Inc. v. Bentritex, Inc., 774 F. Supp. 1269, 1285 (N.D. Cal. 1991).

78.     In Intermedics, the Court considered whether display of an accused devise at a trade show was an infringing "use" under 35 U.S.C. § 271(a).  After reviewing the scant case law regarding an infringing use, the Court concluded that "demonstration of an accused device does not constitute an act of infringement unless the 'totality of the circumstances' also reveals concurrent 'sales oriented' activity which results in, or at least substantially advances, an actual sale of the accused device."  Id. at 1286.  Specifically, the Court held that "mere demonstration or display of an accused product, even in an obviously commercial atmosphere, does not constitute an infringing use under § 271(a)."  Thus, the Court found that the defendant's display of the accused product at a trade show with the indication that it was an "investigational device" did not constitute an infringing use where there was no evidence that the defendant also solicited sales in connection with this demonstration.  See id.; see also Bradshaw v. Igloo Prods. Corp., 912

79.     F. Supp. 1088, 1011 (N.D. Ill. 1996) ("in cases directly addressing the question of whether promotional activity involving an infringing device, but not culminating into a sale of the infringing device, constitutes a violative 'use' under 35 U.S.C. § 271(a), courts have generally held to the contrary").

---

[5] QR Spex believes this number is 11 instead of 10 because Lance Armstrong, a Texas resident, was given an O Rokr engineering sample *in California* for his personal amusement.  There is no evidence, however, that Mr. Armstrong has the O Rokr in Texas or ever took the product to Texas.  Moreover, Mr. Armstrong's arguable "use" of the product would fall under the narrow de minimum use exception.  See Embrex, Inc. v. Service Engineering Corp., 216 F. 3d 1343, 1349 (Fed. Cir. 2000).

80.     The demonstration of engineering samples of O Rokr is likewise nothing more than a demonstration.  (Exhibit B, ¶ 11)  They were not used in a sales oriented manner, but were shown to individuals for their review.  Specifically, they were not used in any way to advance an actual sale, because no sales or pre-orders occurred in Texas.

81.     Several cases have applied this same line of reasoning.  See L.A. Gear, Inc. v. E.S. Originals, Inc., 859 F. Supp. 1294 (C.D. Cal. 1994) (merely observing a use of the accused product or demonstration of the accused product at a trade show is insufficient to constitute infringing use without evidence of contemporaneous sales activity); McKeown v. City of Chicago, 2001 WL 59034 (N.D. Ill., Jan. 19, 2001) (granting summary judgment of non-infringement where defendant incorporated the patented process as part of a bid for a project that may result in future use); Advanced Semiconductor Materials America, Inc. v. Applied Materials, Inc., 1995 WL 419747 (N.D. Cal., July 10, 1995) (no infringing use where plaintiff failed to show that a demonstration aimed at selling a product); Fluid Management Ltd. Partnership v. H.E.R.O. Indus., Ltd., 1997 WL 112839 (N.D. Ill., March 11, 1997) (dismissing for improper venue where no infringing use occurred in the use and demonstration of the accused product that "did not result in any sale, or sale order" of the accused device in the forum); Celotex Corp. v. V.E. Power Door Corp., 204 U.S.P.Q. 636, 638 (E.D.N.Y. 1979) (demonstrations of a product that do not lead to sales are not infringing).

82.     Other cases exist that simply reiterate and set forth examples of where commercial activity was coupled with the sending of samples.  See, e.g., Wayne Pigment Corp. v. Halox & Hammond Group, Inc., 220 F. Supp. 2d 931, 936 (E.D. Wisc. 2002) (defendant's sending samples to distributors in the forum to encourage their purchase of products for future sales was an infringing use); Dentsply Int'l, Inc. v. Great White, Inc., 132 F. supp. 2d 310, 319 (M.D. Penn. 2000) (defendant admitted an infringing use where its sent samples to potential distributors to encourage them to make future purchases); Thorn EMI North American, Inc. v. Micron Tech., Inc., 821 F. Supp. 272, 275 (D. Del. 1993) (sending samples for purposes of soliciting business was an infringing use).

83.     In the present case, however, it bears recognition that Oakley and ODI sent no engineering samples to anyone in Texas.   OSC sent engineering samples to O Store managers and sales representatives "to see how the product performs to evaluate and to give feedback." (Lykos Depo, 67:16-20)  "They are stamped engineering samples, and it's not for sale." (Lykos Depo, 67:13-14)  These samples are not for review by consumers or retailers and are not to be presented in any sales format.  (Lykos Depo, 67:21-68:2)  These activities are for review, education, and personal amusement.   These products are not shown to purchasers, and do not appear in any sales environment or in association with meaningful sales activities.  As such, these engineering samples cannot be an infringing use by Oakley or ODI because they were not sent in the context of sales.

(4)  **The exercise specific jurisdiction over Oakley and ODI would be unreasonable.**

84.     Even if the Court determined that Oakley and ODI have sufficient minimum contacts in Texas, the exercise of jurisdiction would still not be constitutional unless it is reasonable and satisfies "concepts of fair play and substantial justice."  Viam, 84 F. 3d at 429.  This showing requires a balancing of:

> "(1) the extent of a defendant's purposeful interjection; (2) the burden on the defendant in defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum."

Burger King, 471 U.S. at 476-77.  Though such cases typically are those rare situations where the plaintiff's and state's interests are disassociated, a compelling case exists here. See Akro, 45 F. 3d at, 1549.

85.     As set forth above, the extent of Oakley's and ODI's interjection into Texas is non-existent.  Neither has any physical presence here nor actually makes sales in Texas of any product.  The accused O Rokr product has not even been released and will have no sales in

Texas. Where an infringement has not occurred in this district, and will not occur, it is unreasonable to hale Oakley here to litigate.

86. There is a great burden on having Oakley and ODI come to this forum to litigate. Neither have offices here, and will have to bring witnesses and documents to this forum, in addition to retaining local counsel. A list of the potential out-of-state witnesses suggests that there would be not only great costs to having trial go forward in this district, but also a great distraction to Oakley's and ODI's business, as well as that of Motorola and two third party vendors in Singapore and Denmark. (Exhibit A, ¶ 8; Exhibit F, ¶ 4)

87. Texas does have a recognized interest in protecting its citizens and providing recourse for infringement that occurs in the district. See Moore v. Harney Hardware Inc., H-05-4054, 2006 WL 1342820 at *3 (S.D. Tex., May 15,2006). However, no citizens have been injured by any infringing sales in this district, as no alleged infringing activity has occurred in this district. Thus, very little deference should be given this factor.

88. The Eastern District of Texas may very well be an efficient forum for resolution of patent matters generally. However, the Central District of California is also very efficient, and a particularly efficient forum for this case. The Central District of California gets cases to trial approximately four months later than the Eastern District of Texas (20.5 months versus 15.9 months), but tends to get matters resolved and to final disposition more quickly (7.4 months versus 10.3 months). (Exhibit A, Ex. 4-5)

89. Finally, though Courts are generally deferential to a Plaintiff's choice of forum, it should be accorded little deference where QR Spex is not present in this forum, and has not even alleged that it conducts business in this forum. See Hanby v. Shell Oil Co., 144 F. Supp. 2d 673, 677 (E.D. Tex. 2001) (Plaintiff's forum choice was not accorded the usual deference where there was no nexus of infringing activity in the Eastern District of Texas).

90. Together, the balancing of the reasonableness factors favors Oakley, and merits dismissal of this action against Oakley for lack of personal jurisdiction. None of the parties, witnesses, or accused infringing acts are related to this forum.

B.    **The Claim Against Oakley, ODI, and OSC Should Be Dismissed For Improper Venue Because None Of Them "Reside" In The Eastern District Of Texas.**

91.    The first test of whether venue is properly situated is whether the defendant is subject to personal jurisdiction in the district, as if it were a separate forum from the rest of the state. See VE Holding Corp. v. Johnson Gas Appliance Co., 917 F. 2d 1574, 1584 (Fed. Cir. 1990). Where neither Oakley, ODI, or OSC are subject to personal jurisdiction in the Eastern District of Texas, venue is improper as to them.

92.    In patent cases, venue is governed by 28 U.S.C. § 1400(b), which holds that venue to proper in (i) "the judicial district where the defendant resides," or (ii) districts "where the defendant has committed acts of infringement and has a regular and established place of business."  28 U.S.C. § 1400(b).  Where a defendant "resides" is governed by the general venue statute, 28 U.S.C. § 1391(c).  See Nutrition Physiology Corp. v Enviros Ltd., 87 F. Supp. 2d 648, 652 (N.D. Tex. 2000).  Under this statue, a corporate defendant is "deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced."  28 U.S.C. § 1391(c).  The Court must find that jurisdiction is proper in this district alone, as if it were a separate jurisdiction from other districts in Texas.  See Spiegelberg v. Collegiate Licensing Co., 402 F. Supp. 2d 786, 793 (S.D. Tex. 2005)

93.    As set forth fully above, neither Oakley nor ODI are amenable to either general or specific jurisdiction, or under the stream of commerce theory, anywhere in Texas, which includes this district, as well.

94.    OSC is also not subject to personal jurisdiction here, and thus, does not reside in this district for venue purposes.  OSC has no retail locations in the Eastern District of Texas, no offices, no warehouses, and no business presence.  (Exhibit B, ¶ 7)  No employees are in the Eastern District of Texas, and OSC makes no sales in this District.  (Id.)  OSC sells Oakley® product to retail accounts in the Eastern District of Texas.  However, all such sales are governed by a Retail Sales Standards Agreement, which provides that it is performed in California.  (Exhibit B, ¶ 9)  All sales are transacted in California and product is shipped

F.O.B. California.  (Id.)  OSC is not doing business in the Eastern District.  Moreover, there is no evidence of any sale, offer to sell, or use of the accused product by any Oakley Defendant in the Eastern District.

95.    Where Oakley, ODI, and OSC are not subject to the jurisdiction of this Court, and therefore do not "reside" in this district, the first prong of 28 U.S.C. § 1400(b) for venue fails.  Therefore, venue is improper in this district unless the second prong is satisfied and Defendants have "committed acts of infringement and [have] a regular and established place of business" in the Eastern District.  "These tests are stated in the conjunctive and both must be satisfied" to establish the second prong.  15 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 3823, 223-24 (2d ed. 1986).  Even so, the evidence is devoid of any sales, offers for sale to bona fide purchasers, or any uses within the Eastern District of Texas, as set forth fully above.  Therefore, neither step of the analysis for venue shows that venue would be proper as to any of Oakley, ODI, and OSC.  The claim against them must be dismissed, or transferred to a district where it could have been brought, such as the Central District of California.

      C.      **The Claim Against ODI and OSC Should Be Stayed and Transferred, Or Alternatively, the Claim Against Oakley, ODI, and OSC and Motorola Should Be Transferred To the Central District Of California Under 28 § 1404(a).**

            1.      **The action against ODI and OSC must be stayed or transferred under the first-to-file rule.**

96.    ODI and OSC were added as parties to this action 50-days after the complaint was first filed.  In the interim, Oakley and Motorola filed a motion to dismiss.  In their moving papers, filed on June 30, 2006, Oakley mentioned numerous times that ODI and OSC sold Oakley® product, and that Oakley itself makes no sales of any product directly in Texas.  For nearly a month, QR Spex did nothing with this information, even after confirming it in deposition on July 11, 2006.  QR Spex chose to never add ODI and OSC to this action, until

a week after ODI and OSC filed a declaratory relief action in the Central District of California.

97.    On July 10, 2006, ODI and OSC filed a declaratory relief action against QR Spex for non-infringement and invalidity of the patent-in-suit, because they anticipated obtaining O Rokr product for sale across the country, except in Texas and Oklahoma.  (Exhibit B, ¶ 27)  As ODI and OSC are located in California, would receive O Rokr product in California, and sell the product in California, they filed their declaratory relief action there.  (Id.)  Only on July 27, 2006, more than two weeks after the filing of the action in the Central District of California, QR Spex amended its complaint to add ODI and OSC.

98.    As to ODI and OSC, the action in the Central District of California is the first-filed action.  Accordingly, where this is the latter-filed action and involves the same parties and issues as the California suit, as to ODI and OSC, this case must be stayed for judicial comity pending resolution in California or transferred to the Court where the action was first filed.  See Genentech, Inc. v. Eli Lilly & Co., 998 F. 2d 931, 938 (Fed. Cir. 1993).

> ### 2.    **The action against Oakley, ODI, and OSC and Motorola should be transferred under 28 U.S.C. § 1404(a).**

99.    There is already a properly pending lawsuit in the Central District of California, where all Oakley, ODI, and OSC, Motorola and QR Spex are subject to jurisdiction.  The vast majority of evidence related to the relevant issues is in that district, and a substantial number of witnesses are located in California.  This case can be transferred by this Court to any other district where it might have been brought "for the convenience of parties and witnesses, in the interest of justice," 28 U.S.C. § 1404(a), and should be transferred to the Central District of California.

100.    Such a transfer is intended to prevent the waste of time, money, and energy by the parties, witnesses, and the forum.  See In re Triton Sec. Lit., 70 F. Supp. 2d 678, 688 (E.D. Tex. 1999).  This Court has discretion to transfer this case.  See Peteet v. Dow Chemical Co., 868 F. 2d 1428, 1436 (5th Cir. 1989).  The Central District of California should get this case

as there is already another case pending before it seeking declaratory relief of invalidity and non-infringement against QR Spex brought by ODI and OSC.

101.    Before transferring the Oakley/Motorola claim to the Central District of California, the Court should first determine if this claim could have been filed there.  See Zoltar v. LG Electronics Mobile Communications Co., Motorola, Inc., et al., 402 F. Supp. 2d 731, 7334-35 (E.D. Tex. 2005) (transferring venue where case could have been brought, against Motorola and others, to Northern District of California that previously considered asserted patents).  To the extent that there are claims in this action against multiple Defendants, the Court would first have to sever the claim as to Oakley, ODI, and OSC and Motorola, as discussed below, or transfer the action as to all Defendants.  See, e.g., Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F. 2d 1509, 1515 (10th Cir. 1991) (requiring that all defendants be subject to jurisdiction in the transferee forum).

102.    It should be undisputed that QR Spex could have brought this lawsuit in the Central District of California; it brought a substantially similar one there already.  QR Spex does business in that district.  In fact, QR Spex sought to do business with Oakley in the Central District of California in regard to the very technology asserted here, under a contract governed by California law and subject to jurisdiction there.  (Exhibit B, Ex. 4).  Moreover, QR Spex sued Motorola in the Central District of California on a patent for Bluetooth® enabled eyewear and trade secrets related to Bluetooth® enabled eyewear, the underlying technology of this suit.  (Exhibit D, ¶¶ 6-11)  Oakley, ODI, and OSC reside in that district. Motorola does business in that district with Oakley.

(a)    **Private Interest Factors.**

103.    The private factors to consider in transferring venue are: "(1) the plaintiff's choice of forum; (2) the relative ease of access to the sources of proof; (3) the cost of obtaining attendance of witnesses and other trial expenses; (4) the place of the alleged wrong; and (5) the possibility of delay and prejudice if transfer is granted."  In re Triton, 70 F. Supp. 2d at 688.  These factors favor transferring the case.

### (1)    Plaintiff's choice of forum.

104.    Courts are generally deferential to a plaintiff's choice of forum, even when forum shopping.  See Robertson v. Kiamichi RR Co., 42 F. Supp. 2d 651, 655 (E.D. Tex. 1999). However, QR Spex's forum selection should carry little weight because no operative facts occurred in this forum.  See id. at 656. This factor weighs in favor of transfer because no alleged infringement has or will occur in this forum (Exhibit C, ¶ 8) and none of the parties are here.  See ; See also Hanby, 144 F. Supp. 2d at 677; Rock Bit Int'l, Inc. v. Smith Int'l, Inc., 957 F. Supp. 843, 844 (E.D.Tex. 1997).

### (2)    Ease of access to sources of proof.

105.    None of the parties has its headquarters or principal place of business located in this district.  QR Spex is in Oklahoma.  Oakley, ODI and OSC are in California.  Motorola is in Illinois.  Defendants believe that the majority of witnesses in this case are located in California and overseas.  Nine potential witnesses for Oakley reside in California; two or three experts for Oakley reside in California; four of the inventors of the patents-in-suit, which will likely be Plaintiff witnesses, but also defense witnesses, reside in California. (Exhibit A, ¶ 8-9).   Other potential witnesses are in Singapore, Denmark, Chicago, and Atlanta, and Oklahoma.  (Id.; Exhibit F, ¶ 4)  A vast majority of evidence, including expert reports and deposition testimony from previous litigation surrounding the patent-in-suit, is also in California.  See Zoltar, 402 F. Supp. 2d at 738.  Though the convenience of party witnesses is accorded less weigh than non-party witnesses, see Houston Trial Reports, Inc. v. LRP Pub., Inc., 85 F. Supp. 2d 663, 669 (S.D. Tex. 1999), their convenience should not be ignored, especially when no one associated with this suit is actually in Texas.

### (3)    Cost of obtaining attendance of witnesses and other trial expenses.

106.    There is no compulsory process requiring attendance in Texas of any of these witnesses set forth above. The Defendants' anticipated witnesses are in California, Illinois, Georgia, Singapore and Denmark.  (Exhibit A, ¶¶ 8-9; Exhibit F, ¶ 4)  The likely witnesses

for QR Spex include the inventors, which as noted above do not reside in Texas.  (Exhibit A, ¶ 9) No documentary evidence is located here, while a great deal of evidence is sitting in the Central District of California.   Such evidence includes Oakley's evidence regarding the accused product developed with Motorola and evidence from the previous litigation between QR Spex and Motorola, including prior art, deposition testimony, expert reports and expert depositions.  (Exhibit D ¶¶ 7, 10)  Thus, all witnesses and all documentary evidence would need to be corralled into Texas.   In such a situation, deference should not be accorded the Plaintiff's forum selection, see Rock Bit, 957 F. Supp. at 844, and this factor also favors transfer.  See Zoltar, 402 F. Supp. 2d at 739.

(4)     <b>Place of the alleged wrong.</b>

107.    The Defendants are not promoting, offering to sell, marketing, or selling the accused product in the State of Texas.  The product was designed and conceived in California, developed further in California, Illinois, Atlanta, and Denmark, and manufactured in Singapore.  Where there is no alleged infringing activity in the forum, this factor heavily favors transfer.

(5)     <b>Possibility of delay.</b>

108.    The Fifth Circuit stated that only in rare situations is this a relevant factor to consider, and then, only upon a showing of clear and convincing evidence that a delay or prejudice may occur.  See In re: Horseshoe, 305 F. 3d at 358.  As set forth above, the Central District of California generally gets cases to trial four months longer than this District, but the disposition of cases there typically occurs more quickly.  Additionally, one earlier filed case, as to ODI and OSC, is already pending in California.  Thus efficiency and judicial economy merit transferring this case as to Oakley, ODI, and OSC and Motorola for consolidation in the Central District of California.

(b)     <b>Public Interest Factors.</b>

109.    On the other hand, the public interest factors to consider are: "(1) the relative backlog and other administrative difficulties in the two jurisdictions; (2) the fairness of placing the burdens of jury duty on the citizens of the state with the greater interest in the dispute; (3) the

33

local interests in adjudicating local disputes; and (4) the appropriateness of having the case in a jurisdiction whose law will govern the dispute in order to avoid difficult problems in conflicts of laws." In re Triton, 70 F. Supp. 2d at 688.  A balance of these also favors transfer.

(1)     <strong>Administrative difficulties.</strong>

110.    Though the Central District of California tends to have more cases on its docket than this District, it is still efficient at getting cases to disposition and trial.  QR Spex admitted that the Central District of California is a convenient forum when it sued Motorola in the Central District of California for violations in Motorola's sale of other Bluetooth® enabled eyewear.

(2)     <strong>Local Interest and burden of jury duty on the local citizens.</strong>

111.    There is no promotion, offer for sale, or sale of the accused product in this district. None of the parties and none of the witnesses are here.  On the other hand, the accused product was conceived in the Central District of California and many of the witnesses and evidence are there.  In this situation, Defendants believe that the local citizens would have no interest in this matter, which would make it a burden for citizens to have to spend 2-3 weeks serving on a jury.  Certainly the local citizens' and this Court's time, energy, and expenses would be better spent on other matters more relevant to the Eastern District.

(3)     <strong>Conflicts of law.</strong>

112.    Defendants are not aware of any conflicts of law that would be relevant.  There appear to be no choice of law issues.  Both the Central District of California and the Eastern District of Texas are very proficient in the handling of patent cases.

D.     **This Claim Against Motorola And Oakley, ODI, and OSC Should Be Severed Either To Effectuate Transfer Or For Purposes Of Trial.**

113.    QR Spex is simply overreaching on every procedural aspect of this case.  QR Spex lumps five Defendants into a single case, which involves three separate accused products that are distinct, not marketed together, and not sold together.

114.    Severance is intimately related to Rule 20 for joinder.  To properly join multiple parties in a lawsuit, they must all "aris[e] out of the same transaction, occurrence, or series of transactions or occurrences" and there must be a "question of law or fact common to all these persons."  Fed. R. Civ. Proc. 20.  Otherwise, where "the operative facts of each transaction are distinct and unrelated to each other" severance is appropriate under Rule 21.  Movie Systems, Inc. v. Abel, 99 F.R.D. 129, 130 (D. Minn. 1983).

115.    In considering whether to sever the Oakley/Motorola action, the Court should consider the same factors that are typically considered on consolidation, namely, the complexity of the theories and facts, whether the jury may be confused by the intertwining of claims, cross-claims, and third party claims in the same trial, and whether advance disposition of issues in one trial may simply issues in the second trial.  See Baxter Travenol Labs, Inc. v. LeMay, 536 F. Supp. 247, 250 (S.D. Oh. 1982)

116.    Specifically, where "patent infringement claims are brought against multiple, unrelated Defendants, Courts have held joinder to be inappropriate…." Multi-Tech Systems, Inc. v. Net2phone, Inc., 2000 WL 34494824 at *6 (D. Minn., June 26, 2000) (severing patent infringement claims where defendants were unrelated competitors with independent products and services), citing Androphy v. Smith & Nephew, Inc., 31 F. Supp. 2d 620, 623 (N.D. Ill., 1998) ("separate companies that independently design, manufacture and sell different products in competition with each other" should be severed); see also Magnavox Co. v. APF Elec., 496, F. Supp. 29, 34 (N.D. Ill. 1980) (severing defendants where "no indication on this record that the development, marketing, or sales effort involving the different products are related in any way"); New Jersey Mach., Inc. v. Alford Indus., Inc., 21 U.S.P.Q. 2d 2033, 2034-35 (D.N.J. 1991) ("infringement of the same patent by different machines and parties does not constitute the same transaction or occurrence" where the defendants were unrelated, competitors).  Severance is useful in such situations because it avoids jury confusion  as "the determination of facts and the scope of testimony with respect to one defendant will have little relevance to issues raised by another defendant."  Multi-Tech, 2000 WL 34494824 at *7.

117.    Similarly, there is no reason or evidence why the maintenance of the present suit against multiple, non-related defendants selling unrelated, competing products "is necessary to further principles of fundamental fairness, to promote trial convenience, or to expedite the final determination of the instant dispute." Id.  The accused O Rokr is not developed, marketed, or sold in connection with any product from Kyocera, Xonix, or Zeal.  In fact, said Defendants' products compete with the O Rokr.

118.    On the other hand, this is a complex patent case, and there is a likelihood that after weeks of testimony related to the invalidity of the patent and Plaintiff's likely accusations of infringement against three separate products that there will be jury confusion. See Baxter, 536 F. Supp. at 250.  Additionally, there is a strong likelihood that the Oakley/Motorola lawsuit can proceed at a more brisk pace than the claims against the other Defendants – whether in the Central District of California pursuant to a 1404(a) transfer, or in this district. Both Oakley and Motorola are familiar with the asserted patent and technology, having looked at it for business purposes and in previous litigation, respectively.

119.    Thus, the claim against Oakley and Motorola should be severed from the remaining claims and proceed separately.  Upon severance, the claim against Oakley, ODI, and OSC and Motorola should be transferred to the Central District of California, as set forth above.  If not, however, then this claim should proceed separately in this Court.

## IV.    CONCLUSION

120.    For the foregoing reasons, Oakley's, ODI's, and OSC's and Motorola's motions should be granted.

Respectfully submitted,

DATED: August 9, 2006          By:

*/s/ Melvin R. Wilcox III*

_____

Melvin R. Wilcox III
SMEAD ANDERSON & DUNN
2110 Horseshoe Lane
P.O. Box 3343
Longview, TX 75606
Tel: (903) 232-1880
Fax: (903) 232-1889
Email: mrw@smeadlaw.com


*/s/  Gregory K. Nelson*

_____

Gregory K. Nelson
WEEKS, KAUFMAN, NELSON & JOHNSON
462 Stevens Avenue, Suite 310
Solana Beach, CA 92075
Tel: (858) 794-2140
Fax: (858) 794-2141
Email:  wknjlaw@sbcglobal.net

Lead Attorneys for Defendants
OAKLEY, INC., OAKLEY DIRECT, INC., OAKLEY
SALES CORP. & MOTOROLA, INC.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this motion was served on all counsel who have consented to electronic service.  Local Rule CV-5(a)(3)(A).  Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5(e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by certified mail, return receipt requested, on this the 9th day of August, 2006.

*/s/ Melvin R. Wilcox, III*
MELVIN R. WILCOX, III