**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **QR SPEX, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **C.A. NO. 5:06-CV-124 (DF)** |
| | § | |
| **MOTOROLA, INC., et al.,** | § | |
| | § | |
| **Defendants,** | § | |

## ORDER

Pending before the Court in the above styled cause of action is Defendants' Joint Motion to Dismiss, Sever, and/or Transfer (Doc. No. 25). Also before the Court are QR Spex's Response in Opposition to Defendants' Joint Motion (Doc. No. 29), Defendants' Reply Brief in Support of their motion (Doc. No. 37), and QR Spex's Sur-Reply (Doc. No. 44). After reviewing the parties' briefing and the relevant law, the Court is of the opinion that the Defendants' Joint Motion to Dismiss, Sever, and/or Transfer should be GRANTED as follows.

### (I)  Background

QR Spex originally brought suit against Motorola, Inc. (hereafter "Motorola"); Oakley, Inc. (hereafter "Oakley"); Oakley Sales, Corp. (hereafter "OSC"); Oakley Direct, Inc. (hereafter "ODI"); Zeal Optics, Inc.; Xonix Electronics, Co.; Kyocera Wireless, Corp. QR Spex's first amended complaint alleges that the Defendants have infringed its patent. *See* Doc. No. 18. At the present time, Zeal Optics, Inc., and Kyocera Wireless, Corp. have been dismissed. QR Spex is still attempting to serve Xonix, Inc., which is a Chinese corporation. *See* PJ Hr'g Tr. 30, Dec. 13, 2006. The present motion is brought jointly by Motorola, Oakley, OSC, and ODI. Oakley and ODI contest this Court's jurisdiction over them and all four Defendants collectively move the Court to sever the

claims against them and to transfer this case to the Central District of California under 28 U.S.C. § 1404.

As noted, QR Spex alleges that Oakley's O Rokr sunglass infringes its patent. *See generally* Doc. No. 18. "O Rokr" is the marketing name for a Bluetooth enabled product that allows a user to talk on a cell phone or listen to music transmitted from a Bluetooth enabled device. The O Rokr was jointly created by Oakley and Motorola. *See* Doc. No. 25, ex. E at ¶5. While Oakley developed the O Rokr as a whole, Motorola was tasked with creating the electronic boards which support Bluetooth functionality. *See* Doc. No. 25, ex. F at ¶4. Both companies make their respective components of the O Rokr and then sell them to an independent vendor in Singapore for assembly. *See* Doc. No. 25, ex. C at ¶4. At the time that this suit was filed the O Rokr was not yet on the market. *See* Doc. No. 25, ex. E at ¶5; ex. C at ¶4. However, the O Rokr is now offered for sale in all states except for Texas and Oklahoma. *See* Doc. No. 25, ex. C at ¶5.

When this suit was filed Oakley promptly began action to, as QR Spex puts it, "divest this Court of jurisdiction." For example, the ten samples of the O Rokr given to Texas "O Stores" and to certain Oakley sales representatives in Texas were immediately removed from this state. *See* Doc. No. 31, ex. C at ¶7. In addition, Oakley's website made clear that the O Rokr glasses would not be offered for sale in Texas. The facts now before the Court show that twelve O Rokrs reached Texas.[1] Four of those O Rokrs were sent as samples to independent sales representatives in Texas who planned to market Oakley's product to third-party retailers in Texas. *See* Doc. No. 25 at 10. Six more O Rokrs were sent to Oakley's Texas "O Store" managers as engineering samples. *Id.* Soon

_____

[1] Oakley gave one O Rokr to Lance Armstrong, a Texas resident, while Mr. Armstrong was in California. However, there is no evidence that Mr. Armstrong brought the O Rokr to Texas or that he has used it in Texas.

after this suit was filed, all ten of the engineering samples were returned to Oakley. *Id.*

The final two O Rokrs to reach Texas were those purchased by Chris Jones. *See* Doc. No. 44 at 4. QR Spex retained Chris Jones, ostensibly a private investigator based in Marshall, Texas, to seek out and purchase O Rokr glasses via the "stream of commerce." *Id.* Mr. Jones was able to purchase two O Rokrs. *Id.* The first O Rokr was purchased from the Oakley "O Store" located in Scottsdale, Arizona. *Id.* at 5. Mr. Jones telephoned the store's assistant manager and inquired about having an O Rokr sent to Texas. *Id.* Not knowing the motives of either Mr. Jones or QR Spex, the assistant manager assured Mr. Jones that she could ship an O Rokr to him if he would first mail a money order to her in Arizona. *See* PJ Hr'g Tr. 9. Mr. Jones complied and he received his O Rokr in Marshall, Texas on September 1, 2006. Mr. Jones purchased the second O Rokr from HDO Sports's website on August 21, 2006. *See* Doc. No. 44 at 4. Mr. Jones placed the online order, paid by credit card, and received the O Rokr on August 24, 2006. *Id.* At oral argument Oakley informed the Court that upon learning of these purchases the assistant manager in Scottsdale was disciplined, all Oakley retailers were again instructed not to make any sales to Texas residents, and the O Rokr was removed from the HDO Sports website. *See* PJ Hr'g Tr. 8-9.

In any event, the evidence shows that Oakley, ODI, OSC, and Motorola (hereafter collectively referred to as "Defendants") do not and will not offer the O Rokr for sale in Texas or to Texas residents any time in the near future. *See generally* Doc. No. 25, ex. B-E. As a result, Oakley and ODI move this Court to dismiss them for lack of personal jurisdiction because the O Rokr has not, and will not, enter Texas via the stream of commerce. In the alternative, the Defendants move this Court to either dismiss for improper venue or to transfer this case to the Central District of California under 28 U.S.C. § 1404.

3

## (II) PERSONAL JURISDICTION

**(A)     Applicable Law**

Federal Circuit precedent controls personal jurisdiction in patent cases because the issue is "intimately involved in the substance of enforcement of the patent right." *Viam Corp. v. Iowa Export-Import Trading Co.*, 84 F.3d 424, 428 (Fed. Cir. 1996). The Federal Circuit applies the Supreme Court's minimum-contacts test in patent cases even though the Due Process Clause of the Fifth Amendment, not the Fourteenth, is at issue. *See Akro*, 45 F.3d at 1544. In either case, a district court must evaluate whether an exercise of jurisdiction is proper under the forum state's long-arm statute as well as the Federal Constitution. *See Viam*, 84 F.3d at 427. Because the long-arm statute in Texas is co-extensive with federal limits on personal jurisdiction, the issue here is whether sufficient contacts exist between Oakley and the State of Texas to establish personal jurisdiction under the federal due-process clause. *See id.*

The Supreme Court has established that under the Constitution, a court may only exercise personal jurisdiction over a defendant if it has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). When evaluating whether sufficient contacts exist between a defendant and the forum to support jurisdiction over that defendant, courts often evaluate the concepts of specific jurisdiction and general jurisdiction. *See, e.g., Viam*, 84 F.3d at 427. Specific jurisdiction exists where "the cause of action arises directly from the defendant's contacts with the forum." *Id.* A court may exercise general jurisdiction over a defendant where "the defendant's contacts at issue have no necessary relationship to the cause of action" but are so systematic and continuous that jurisdiction is appropriate and reasonable. *See id.* In addition, there

4

is a third, independent basis for personal jurisdiction known as the stream-of-commerce theory. *Id.* The Federal Circuit has made clear that "the stream of commerce theory has achieved fairly wide acceptance in the federal courts." *Beverly Hills Fan*, 21 F.3d at 1564. Furthermore, the distinction between specific jurisdiction and general jurisdiction is of little value in "stream-of-commerce" cases because the scenario is one where "the defendant's contacts are the result of establishing a distribution network in the forum State for the sale of defendant's products." *Beverly Hills Fan*, 21 F.3d at 1566.

The stream-of-commerce theory originated in the Supreme Court's *Volkswagen* decision. In *Volkswagen* the Court held that the exercise of jurisdiction over a defendant is permissible when the sale of its product "is not simply an isolated occurrence, but arises from the efforts of the [defendant] to serve, directly or indirectly, the market for its product." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Notwithstanding, the stream-of-commerce theory "comes in several variants" and there is no uniform approach to its application. *See Beverly Hill Fan*, 21 F.3d at 1564. The Supreme Court's *Asahi* decision exemplified the disagreement between the Court concerning the exact requirements of the stream-of-commerce theory. *See generally Asahi Metal Ind. v. Superior Ct.*, 480 U.S. 102 (1987). In *Asahi*, four members of the Court felt that in order for a court to exercise personal jurisdiction over a party, the party must not only place the product into the stream of commerce, but also must take some "action . . . purposefully directed toward the forum State." *See Asahi*, 480 U.S. at 112; *see also Beverly Hills Fan*, 21 F.3d at 1566 (discussing precisely this disagreement between the Justices in *Asahi*). By contrast, four other members of the Court concurred in the judgment, but felt that no act other than placing the product in the stream of commerce was necessary. *See Asahi*, 480 U.S. at 117 (Brennan, J., concurring).

Those four Justices felt that the benefits from the retail sale of the final product in the forum was sufficient to confer jurisdiction over a party. *See id.* To date, the Federal Circuit has not resolved the issue of which requirements are necessary for personal jurisdiction under the stream of commerce theory. *See Beverly Hills Fan*, 21 F.3d at 1566. The Federal Circuit has, however, created a stream-of-commerce doctrine that focuses on whether the defendant's contacts with the forum are purposeful in order to "ensure that non-residents have fair warning that a particular activity may subject them to litigation with the forum." *Beverly Hills Fan*, 21 F.3d at 1565. In any event, courts have often been able to determine whether they may properly exercise personal jurisdiction over a defendant without choosing one version of the theory over the other. *See, e.g.*, *id.* at 1566; *Marshall Packaging Co., LLC v. Nestle Waters N. Am., Inc.*, 6:05cv295 (E.D. Tex. March 24, 2006).

**(B)     Discussion**

**(1)     Minimum Contacts**

Oakley argues that this Court may not properly exercise jurisdiction over it. Neither Oakley nor ODI directly sell products in Texas, which Oakley argues limits any possible basis for jurisdiction over it to contacts under the stream-of-commerce theory. In addition, Oakley argues that the stream-of-commerce theory is limited to scenarios where the accused product reaches the forum. Thus, Oakley asserts that the stream-of-commerce theory does not support jurisdiction in this case "because the accused product has not made its way to Texas through Oakley or ODI's channels of distribution." *See* Doc. No. 25 at 15.

QR Spex argues that the stream-of-commerce theory does not require an accused product to reach the forum. Relying on two unreported district court decisions, QR Spex specifically notes that while stream-of-commerce cases commonly involve scenarios where the product reaches the forum,

"the courts have **not** limited the stream-of-commerce theory solely to those circumstances." *See* Doc. No. 29 at 23 (emphasis in original). As a result, it argues that Oakley is subject to jurisdiction in Texas because it has purposefully established distribution channels to distribute its products in Texas. If, however, the stream-of-commerce theory is limited to situations where the accused product reaches the forum, QR Spex alternatively argues that jurisdiction is proper because O Rokrs have been used and offered for sale in Texas.

### (a)    *Whether the Infringing Product Must Reach the Forum*

The parties present the Court with what is apparently an issue of first impression: whether the stream-of-commerce theory can support personal jurisdiction over a defendant even if the allegedly infringing product never reaches the forum through the stream of commerce. Traditionally, personal jurisdiction doctrine focused on whether a party's contacts were sufficient to give it fair warning of being hailed into court. However, the case law also anticipated a litigant's opportunity to avoid the jurisdiction of a forum by limiting its contacts therein. For example, the Supreme Court stated in *Volkswagen*, "[w]hen a corporation 'purposefully avails itself of the privilege of conducting activities within the forum State,' it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, *or, if the risks are too great, severing its connection with the State*." *Volkswagen*, 444 U.S. at 297 (quoting *Hanson v. Denckla*, 357 U.S. at 25) (emphasis added). The Supreme Court's language implies that, even in today's modern economy, a defendant can avoid jurisdiction by purposefully avoiding a particular State. Likewise, it implies that there is still a practical limit to the stream-of-commerce theory.

To be sure, every controlling stream-of-commerce case that this Court is aware of involves

a scenario where the accused product actually reaches the forum. *See, e.g.*, *Beverly Hills Fan*, 21 F.3d at 1563 (concerning fifty three allegedly infringing products present for sale in the forum); *Viam*, at 429 (discussing the defendant's intentional use of a California distributor to aid the sale of its products in California); *see also Ideal Instr., Inc. v. Rivard Instr., Inc.*, 2006 WL 1217201 (N.D. Iowa May 8, 2006) (involving a situation where a distributor in the forum was selling the accused product). Plaintiff has drawn the Court to only two unreported decisions which could ostensibly support extension of the doctrine to scenarios where the product never reaches the forum. The Court finds those cases, *Taylor v. Ishida Co.*, and *Finck Cigar Co. v. El Duque Group, Inc.*, unpersuasive. For example, in *Finck Cigar*, the Western District of Texas merely allowed the plaintiff additional discovery in order to develop his theory that the court could maintain general jurisdiction over the defendant. *See Finck Cigar Co., Inc. v. El Duque Group, Inc.*, 1999 WL 33290620, at *2-3 (W.D. Tex. Oct. 29, 1999). In fact, the *Finck Cigar* court stated that the alternative stream-of-commerce theory would most likely not support jurisdiction over the defendant because the plaintiff in that case failed to "show that the defendant's activities were purposefully directed at the forum state." *See id.* at *3 (citing *Viam*, 84 F.3d at 427). Given that the plaintiff in that case was arguing for general jurisdiction over the defendant, the *Finck Cigar* decision does not persuade this Court that the product need not reach the forum to support jurisdiction under the stream-of-commerce theory. Likewise, this Court is not persuaded by the *Taylor* decision. In *Taylor* the Northern District of Texas did find that the defendant had fair warning that its sales through its distributor "might subject it to litigation in Texas" even though the infringing product never reached the forum. *See Taylor v. Ishida Co., LTD*, 2002 WL 1268028, at *5 (N.D. Tex. May 31, 2002). Although this Court could reasonably question the correctness of the unpublished *Taylor* decision, it need not because *Taylor*

8

is distinguishable from the facts at bar.  In *Taylor* the defendant's largest buyer of the product at issue, Frito-Lay, was located in Texas.  The defendants' sales to Frito-Lay of similar non-infringing products comprised a substantial portion of their overall sales.  *See id.*  There was also evidence that the allegedly infringing product was demonstrated at an out of state trade show.  *Id.*  Therefore, the court stated, "[i]t is reasonably inferable that [the defendant] knew and intended that its exclusive United States distributor would sell [the infringing product] in this state, where the largest [buyer] has its headquarters."  *See id.*  Thus, the *Taylor* court found that the defendant knew of and intended the sale of allegedly infringing products in the forum.  Similar circumstances do not exist here because there is no evidence before the Court that Oakley has any clients in Texas that would comprise a substantial portion of the O Rokrs' overall sales.  In fact, the opposite is true given Oakley's extensive efforts to not market the O Rokr in Texas and to intentionally avoid shipping or distributing the O Rokr here.  Even indirect sales of the O Rokr have been avoided through Oakley's insistence that non-affiliated retailers of its products avoid selling or offering the O Rokr for sale in Texas.

Given these circumstances and the controlling precedent, the Court finds that an exercise of personal jurisdiction under the stream-of-commerce theory is only appropriate where the allegedly infringing product reaches the forum.  Such a rule is congruent with the Federal Circuit's general observations that there are real limits to a court's jurisdiction under the due process clause.  For example, the *Beverly Hills* court seemingly foreshadowed a defendant's ability to avoid a court's jurisdiction.  That court concluded that a defendant intentionally marketed its allegedly infringing product in the forum because "several months before the lawsuit was filed, and presumably before the fans referred to in the [defendant's agent's] declaration were shipped into [the forum], [the

defendant was] notified of [the plaintiff's] charge that the accused fan infringed the [patent-in-suit]." *See Beverly Hills*, 21 F.3d at 1567-68. It follows that the defendant could have avoided the district court's jurisdiction if it had severed its contacts with the forum following notice of the alleged infringement. Even the *Viam* decisions notes that the defendant "did not simply place its product into the stream of commerce," but instead "knowingly and intentionally exploited the [forum] market through its [advertising and channels of distribution]." Thus, the remaining issue is whether the few O Rokrs that did physically enter the State of Texas vested this Court with jurisdiction over Oakley.

### (b)    Whether the Alleged Infringement Arises From the Channels of Distribution

In analyzing minimum contacts under the stream-of-commerce theory, the Federal Circuit has maintained the general requirement from specific jurisdiction analysis that the litigation must arise out of or relate to a litigant's contacts with the forum. Thus, the *Viam* court couched the jurisdictional inquiry as a two-pronged issue: whether the defendant "purposefully directed his activities at residents of [the forum] and, if so, whether the litigation results from alleged injuries that arise out of or relate to those activities." *See Viam*, 84 F.3d at 428 (quoting *Akro*, 45 F.3d at 1545); *see also Beverly Hills*, 21 F.3d at 1565 (finding that jurisdiction existed because the defendants "purposefully shipped the accused fan into [the forum state] through an established distribution channel [and]. . . . [t]he cause of action for patent infringement is alleged to arise out of these activities."). Here, there is little disagreement that Oakley has established a sophisticated distribution network to purposefully direct its products at Texas. The Court must focus, therefore, on whether the alleged infringing activities at the core of this suit arose from or relate to Oakley's distribution channels.

In this regard, Paragraph 10 of QR Spex's Amended Complaint states:

> Upon information and belief, Defendants have used or are using, have sold or are selling, or have offered to sell or are offering to sell their products, including the allegedly infringing products, directly to consumers in this District and/or have placed their products in the stream of commerce knowing that such products will be used, sold, or offered to be sold by their partners, distributors, intermediaries, or subsidiaries to consumers in this District.   Specifically, Defendant Oakley has intentionally established multiple distribution channels to offer its products for sale and to sell its products, including the infringing products, in this State and District.

Doc. No. 18, ¶ 10.

Following notice of this lawsuit, Oakley completely cut off and severed its ties with Texas as they relate to the allegedly infringing O Rokr.   Nonetheless, the Court must evaluate whether any allegedly infringing use, sale, or offer to sell of an O Rokr occurred in Texas.

### (i)    Infringing Use

First, QR Spex argues that Oakley placed the O Rokr into the stream of commerce in order for an infringing use to take place in Texas.   Specifically, QR Spex argues that the ten engineering samples sent into Texas prior to the filing of this suit were not merely demonstrative samples, but instead constituted an infringing use by those who received the samples.   The corresponding issue is whether the use of the engineering samples in Texas must be substantially sales oriented.

Citing *Intermedics v. Ventritex*, 775 F. Supp. 1269, 1285 (N.D. Cal. 1991), Oakley argues that the totality of the circumstances must reveal that the use of a potentially infringing product must "substantially advance [the] actual sale of the accused device."   *See* Doc. No. 25 at 24.   QR Spex counters with *Wayne Pigment v. Haloz & Hammond Group* for the proposition sending samples into a forum to evaluate the products's utility as a commercial product is sufficient to support personal jurisdiction if that product, "when used for its intended purpose, allegedly infringed [the] plaintiff's patent."   *See* Doc. No. 29 at 31 (quoting *Wayne Pigment Corp.*, 220 F. Supp. 2d at 936).

11

Furthermore, QR Spex argues that Oakley's reliance on *Intermedics* is misplaced in light of the more recent *Donnelly v. Reitter & Schefenacker* decision.  In that case, the Western District of Michigan held that *Intermedic*'s requirement that the demonstration of an accused product must lead to a sale of the product "before the demonstration can be considered 'use,'" is too narrow an interpretation of the word "use."  *See Donnelly*, 189 F. Supp. 2d at 704.  The *Donnelly* court instead held that if an "alleged infringer was still attempting to garner sales by displaying the accused product," then such an act is sufficient to threaten the rights of the patentee.  *See id.*  Therefore, the *Donnelly* court found an exercise of jurisdiction appropriate because the defendant in that case displayed sample products to "a potential customer" with the intent of "'generat[ing] interest in a potential infringing product to the commercial detriment of the rightful patentee.'"  *See id.* (citing *3D Systems*, 160 F.3d at 1379).

The present case, however, is distinguishable based on that very point.  Here, there was no sale arising from the engineering samples and there is no evidence that the engineering samples were used to garner the interest of any customers.  *Contra Donelly*, 189 F. Supp. 2d at 704.  Even *Wayne Pigment* involved the delivery of samples to potential customers in order for those entities "to determine whether to purchase [the allegedly infringing product] for commercial purposes."  Here, the engineering samples were only sent to O Store managers and four independent sales representatives.  *See* Doc. No. 31, ex. C at ¶ 7-8.  The Court finds that the samples were merely for demonstrative purposes and is insufficient to subject Oakley to jurisdiction.  *Cf. Intermedics*, 775 F. Supp. at 1286.  In short, there was no use of the O Rokr in Texas that met the general goal of the federal statutory scheme: to deter conduct "generating interest in a potential infringing product to

the commercial detriment of the rightful patentee." *See 3D Systems*, 160 F.3d at 1379.

                         *(ii)*       *Offers to Sell*

       QR Spex next argues that Oakley has offered the O Rokr for sale in Texas via the stream of commerce and its distribution channels. *See* Doc. No. 29 at 24. QR Spex specifically alleges that ODI offered the infringing O Rokrs for sale by allowing customers to place pre-orders for the O Rokr on the Oakley website. QR Spex notes that, originally, the pre-orders on the website were not limited to customers outside of Texas. On the other hand, Oakley counters that no pre-orders were made by Texas residents and that no sale was ever made in Texas. Furthermore, Oakley explains that an "offer to sell" is an offer in which a sale will occur prior to the expiration of the term of the patent. Oakley avers that since the pre-orders did not contain a projected delivery date, they were not offers to sell under § 271.

       Given the facts of this case, the Court finds that Oakley's argument is correct. The Federal Circuit has established that "offers to sell" as used in § 271(a), is to be construed under traditional contract law. *See Rotec Ind., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1254-55 (Fed. Cir. 2000). More recently, a fellow district court has read *Rotec* to require marketing efforts to include specific terms and sufficient definiteness, as required by common-law principles of contract law, to rise to the level of an offer to sell. *See Moldflow Corp. v. Simcon, Inc.*, 296 F. Supp. 2d 34, 44 (D. Mass. 2003). The Court finds that a website that allows a viewer to place a pre-order is not an offer to sell. The rule in Texas is that the Uniform Commercial Code (hereafter "UCC") governs the sale of goods. *See Selectouch Corp. v. Perfect Starch, Inc.*, 111 S.W.3d 830, 834 (Tex. App.—Dallas 2003, no writ) ("Contracts relating to the sale of goods are governed by article two of the Uniform Commercial Code (UCC), adopted in Texas as chapter two of the business and commerce code.").

Under the UCC, Oakley's willingness to accept pre-orders did not constitute offers to sell. Instead, any response received from a customer would be viewed as an offer to buy which would invite Oakley's acceptance by prompt shipment of goods. *See* Tex. Bus. Comm. Code §2.206(a)(2) (Vernon 1994); *BarclaysAmerican/Business Credit, Inc. v. E & E Enters.*, 697 S.W.2d 694, 697 (Tex. App.—Dallas 1985, no writ). Furthermore, the terms on Oakley's website surrounding the pre-orders were indefinite and lacked key details such as delivery terms. Yet, under Texas law, an offer must be definite and must be more than a mere invitation for an offer from another. *See, e.g.*, *Baldwin v. New*, 736 S.W.2d 148, 152 (Tex. App.—Dallas 1987, writ denied) ("Where an 'offer' is so indefinite that it is impossible for a court to decide just what it means and to fix exactly the legal liability of the parties, its acceptance cannot result in an enforceable agreement; furthermore, an invitation to enter into negotiations is not an 'offer' which, together with an acceptance thereof, forms a 'contract.'"). Thus, the ability to place a pre-order on the oakley.com website, which did not originally restrict Texas residents from so doing, was not an offer to sell the O Rokr in Texas. The Court's conclusion is further supported by the fact that there is no evidence before the Court that any Texas resident even responded to Oakley's invitation.

(iii)    <i>Actual Sales</i>

Finally, the Court should address the two O Rokrs that reached Texas as a result of the "sales" initiated by QR Spex's investigator. Both sales consisted of the investigator, Mr. Jones, reaching out to non-Texas retailers and having an O Rokr shipped to Texas. The Court finds it unnecessary to consider these purchases because they constitute QR Spex's unilateral acts; albeit acts that successfully circumvented the measures Oakley undertook to avoid availing itself to this forum. *See Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County*, 480 U.S. 102,

14

109 (1987) (rejecting the notion that "a consumer's unilateral act of bringing the defendant's product into the forum State was a sufficient constitutional basis for personal jurisdiction over the defendant."). In any event, the Court cannot conclude that these sales are evidence that Oakley or ODI purposefully availed themselves to this forum. Additionally, the Court finds that the O Rokr given to Lance Armstrong while he was in California does not constitute evidence that Oakley purposefully availed itself to Texas. Even though he is a Texas resident, there is no evidence before the Court to show that Mr. Armstrong ever brought the O Rokr to Texas or that he ever even used it. In light of all of the foregoing, the Court concludes that Oakley and ODI do not have sufficient minimum contacts with this forum to subject them to the personal jurisdiction of this Court under the stream-of-commerce theory.

### (2)     Fair Play and Substantial Justice

Even though the Court finds that minimum contacts do not exist in this case, it also finds that an exercise of personal jurisdiction would not comport with traditional notions of fair play and substantial justice. The Federal Circuit has noted that in so considering the reasonableness of an exercise of personal jurisdiction a court should consider "(1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the interest of the states in furthering their social policies." *See Viam*, 84 F.3d at 429. The *Viam* court also noted that the instances where principles of fair play and substantial justice will defeat a court's jurisdiction are "'limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum.'" *See id.* (quoting *Akro*, 45 F.3d at 1549).

Here, the Court finds that Texas and this Court have little interest in adjudicating this dispute. Typically, patent infringement cases concern products that the citizens of this state and this district have interaction with. On the other hand, there is no evidence before the Court showing that any citizen of this state, let alone this district, owns or uses an O Rokr. For the same reasons, the Court cannot conclude that Texas has any great stake in furthering its interests, if any, in this suit.

In addition, the burden on Oakley and ODI to litigate this case here would be great. Oakley, ODI, and OSC have gone to great lengths to avoid selling the O Rokr product in Texas. They have posted notices on their own website and have informed all of their employees of their policy to avoid any direct sales of the O Rokr to Texas. In order to avoid indirect distribution of the O Rokr in Texas, they have even notified their independent retailers and suppliers of their policy and mandated that they too refuse to sell O Rokrs in Texas. Further, Oakley and ODI are Washington corporations with their principal place of business in Foothill Ranch, California. Even though Oakley has established a distribution network in Texas, its only contacts with this state are through its subsidiaries. Oakley has also brought an action for declaratory judgment in its home forum, the Central District of California. Although, the judicial system and this Court share an interest in quickly resolving this dispute, the Court cannot conclude that its interests outweigh the burden the Oakley defendants are confronted with or their interests in resolving this matter elsewhere. Thus, the Court finds that this case is one of those rare circumstances where an exercise of personal jurisdiction would not comport with notions of fair play and substantial justice.

### (II) Alter Ego

QR Spex argues that both OSC and ODI are subject to this Court's general jurisdiction. *See* Doc. No. 29 at 39. Therefore, QR Spex argues that this Court may exercise jurisdiction over Oakley

16

because it is merely the alter ego of OSC and ODI.  *See id.*  Specifically, QR Spex alleges that

Oakley exercises "complete management control over its subsidiaries," owns all of the stock in OSC

and ODI, and that Oakley, OSC, and ODI share officers.  *See* Doc. No. 29 at 29-31.  Under the

authority of *Gardemal v. Westin Hotel Corp.*, QR Spex asserts that the facts of this case support

jurisdiction over Oakley as the alter ego of its subsidiary.  *See* Doc. No. 29 at 39. (citing *Gardemal*

*v. Westin Hotel Corp.*, 186 F.3d 588, 594 (5th Cir. 1999).

       As a collateral matter, the Court must consider QR Spex's premise that both OSC and ODI

are amenable to general jurisdiction in Texas.  Defendants concede that this Court has general

jurisdiction over OSC given its Frisco, Texas store.  *See* Motion to Dismiss Hr'g Tr. 5-6.  However,

the issue remains whether this Court may exercise general jurisdiction over ODI even though

specific jurisdiction is inappropriate.  QR Spex argues that general jurisdiction exists because ODI

operates an interactive website that Texas residents can access.  *See* Doc. No. 29 at 39-40.  The Court

disagrees.  As a general rule, "'the ability of [forum] residents to access the defendants' websites .

. . does not by itself show any persistent course of conduct by the defendants in the [forum].'"

*Trintec Ind., Inc. v. Pedre Promotional Prod., Inc.*, 395 F.3d 1275, 1281 (Fed. Cir. 2005) (quoting

*GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000)).  In addition,

the Fifth Circuit has noted that operation of an interactive website is unlikely to rise to the level of

"substantial, continuous and systematic contacts required for a finding of general jurisdiction."

*Revell v. Lidov*, 317 F.3d 467, 471 (5th Cir. 2002).  That court succinctly stated that in such a

scenario a defendant "may be doing business *with* Texas, [although] it is not doing business *in*

Texas."  *Id.* (emphasis in original).

       Here, the record and pleadings simply indicate that ODI is operating the oakley.com website

17

and that Texas residents can review and buy Oakley brand products (with the exception, of course, of the O Rokr). There is no evidence that ODI has any other operations in Texas or that the Oakley website is directed at Texas residents any more than it is other users of the internet. This Court has previously stated that it "remain[s] clear that technology cannot eviscerate the constitutional limits on a state's power to exercise jurisdiction over a defendant." *See J-L Chieftan, Inc. v. Western Skyways, Inc.*, 351 F. Supp. 2d 587, 593 (E.D. Tex. 2004) (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711 (4th Cir. 2002)). Given this understanding and the record in this case, the Court finds that ODI is not subject to general jurisdiction in Texas.

Therefore, the Court must consider QR Spex's argument that this Court may exercise jurisdiction over Oakley because it is merely the alter ego of OSC. In support of its position, QR Spex cites the Fifth Circuit's *Gardemal* decision to support its contention that the lines of distinction between OSC and Oakley are so blurred that the two become one. *See* Doc. No. 29 at 40. The Court finds, however, that the *Gardemal* decision actually exemplifies the reasons that Oakley is not merely OSC's alter ego. For example, in *Gardemal* the Fifth Circuit was confronted with a situation where a plaintiff alleged that a domestic corporation was operating as the alter ego of a foreign corporation. *See Gardemal*, 186 F.3d 588, 593 (5th Cir. 1999). Among other things, the plaintiff pointed out that the domestic corporation owned most of the foreign entity's stock, that the two shared common officers, and that the domestic entity oversaw and controlled advertising and marketing operations. *Id.* at 593. Nonetheless, the Fifth Circuit held that the relationship was simply "a typical corporate relationship between a parent and subsidiary." *Id.* The court stated, "one-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying the alter ego theory." *Id.* at 594.

18

The present case is analogous.  Here, QR Spex argues that Oakley owns one-hundred percent of the stock in OSC, that the two entities share common officers, and that Oakley exercises "an extraordinary degree of control" over its subsidiaries because it maintains at least some level of control over the marketing and advertising of Oakley products.  *See* Doc. No. 29 at 29-31.  The Court is left unconvinced.  For example, although Oakley does perform some functions for both OSC and ODI, they reimburse Oakley for such expenses as rent and pay for the other functions such as shipping costs.  In addition, Oakley's oversight of such things as brand marketing conducted by OSC is not surprising given Oakley's trademark, copyright, and patent interests in its products.  The Court is fully aware that the corporate form should not be lightly disregarded.  *See Manvill Sales Corp. v. Paramount Sys. Inc.*, 917 F.2d 544, 552 (Fed. Cir. 1990) (citing *Zubick v. Zubick*, 384 F.2d 267 271-72 (3d Cir. 1967).  Especially in light of the *Gardemal* decision, the Court finds that QR Spex has failed to show that the separateness of Oakley, ODI, and OSC has ceased.  As a result, alter ego is not a proper basis to find personal jurisdiction.

In light of the foregoing discussion, the Court finds that it may not maintain personal jurisdiction over Oakley or ODI.  As a result, they are DISMISSED from this action.  The Court now addresses OSC and Motorola's alternative motion to transfer the claims against them to the Central District of California.

### (III) Venue

Defendants' joint motion also moves the Court to either dismiss the claim against Oakley and ODI[2] for improper venue, or to transfer the claims against Oakley, ODI, OSC, and Motorola to the

---

[2]The Defendants' joint motion originally argued that the Court should also dismiss the claims against OSC since it did not reside in the Eastern District of Texas.  However, at the hearing on these matters, OSC conceded that its Frisco, Texas store is within the Eastern District

Central District of California under 28 U.S.C. § 1404. As explained, Oakley and ODI are not subject

to this Court's personal jurisdiction. Under the applicable law, the Court may not transfer venue as

to a party it has no jurisdiction over. *See Hollyanne Corp. v. TFT, Inc.*, 199 F.3d 1304, 1307 (Fed.

Cir. 1999) ("[W]e hold that once it had decided that it lacked personal jurisdiction and had dismissed

the complaint, the district Court could not properly transfer the case."). Thus, the motion to dismiss

or transfer venue as to Oakley and ODI is denied. As to OSC and Motorola, who both reside in this

district and are subject to this Court's jurisdiction, the Court considers their motion to transfer venue

under 28 U.S.C. § 1404.

**(A)      Applicable Law**

28 U.S.C. §1404(a) allows for transfer of a case by a district court to avoid waste, expense,

and inconvenience. *See In re Triton Ltd. Sec. Litig.*, 70 F. Supp. 2d 678, 688 (E.D. Tex. 1999)

(citing *State St. Capital Corp. v. Dente*, 855 F. Supp. 192, 197 (S.D. Tex.1994)). Along these lines

§1404(a) reads:

> For the convenience of the parties and witnesses, in the interest of justice, a district
> court may transfer any civil action to any other district or division where it might
> have been brought.

28 U.S.C. § 1404(a)

The purpose of the statute is to give district courts discretion to evaluate venue issues on a case-by-

case basis in light of convenience of the parties and costs to the judicial system. *See Stewart Org.,*

*Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).

The first step in determining a motion under § 1404(a) "is whether the judicial district to

which transfer is sought would have been a district in which the claim could have been filed." *In*

---

of Texas and that it resides in this district for venue purposes. *See* Hr'g Tr. 7, December 13,
2006.

*re Volkswagen*, 371 F.3d 201, 203 (5th Cir. 2004). If so, a court must then determine whether an

action should be transferred by examining both public and private factors. *See id.*; *see also In re*

*Triton*, 70 F. Supp. 2d at 688. The private factors, which relate to the convenience of the litigants,

include:

> (1) the plaintiff's choice of forum; (2) the relative ease of access to the sources of
> proof; (3) the cost of obtaining attendance of witnesses and other trial expenses; (4)
> the place of the alleged wrong; and, (5) the possibility of delay and prejudice if
> transfer is granted.

*Id.* (citing *Mortenson v. Maxwell House Coffee Co.*, 879 F. Supp. 54, 56 (E.D. Tex. 1995) and *Walter*

*Fuller Aircraft Sales v. Republic of Philippines*, 965 F.2d 1375, 1389 (5th Cir. 1992)).

The public factors, which reflect the "public interest in the fair and efficient administration

of justice," consist of:

> (1) the relative backlog and other administrative difficulties in the two jurisdictions;
> (2) the fairness of placing the burdens of jury duty on the citizens of the state with the
> greater interest in the dispute; (3) the local interest in adjudicating local disputes; and,
> (4) the appropriateness of having the case in a jurisdiction whose law will govern the
> dispute in order to avoid difficult problems in conflicts of laws.

*Id.*

In a motion to transfer venue under § 1404(a) the moving party bears a heavy burden of

demonstrating why the factors "'clearly favor such a change.'" *Id.* (quoting *TV-3, Inc. v. Royal Ins.*

*Co. of Am.*, 28 F. Supp. 2d 407, 411 (E.D. Tex.1998)). In meeting its burden a defendant may not

merely make unfounded assertions, but instead must "establish relevant venue facts by affidavit,

deposition or otherwise." *Id.*

**(B)    Discussion**

**(1) Private Interest Factors**

*(a) Plaintiff's Choice of Forum*

It is well established that a plaintiff's choice of forum "is usually highly esteemed." *See In*

*re Triton Ltd. Sec. Litig.*, 70 F. Supp. 2d at 688 (quoting *Texas Instruments, Inc. v. Micron Semiconductor*, 815 F. Supp. 994, 996 (E.D. Tex. 1993)).  The basis for this deference arises from the adversary system itself and affords counsel the opportunity to serve his client's interests by selecting a forum that is most conducive to his cause.  *See id.* at 689 (quoting *McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1261-62 (5th Cir. 1983)).  While this factor is neither conclusive nor determinative, *see In re Horseshoe*, 337 F.3d at 434, in most cases the plaintiff's choice of forum "should not be lightly disturbed."  *See In re Triton*, 70 F. Supp. 2d at 689.

In the present case Defendants argue that QR Spex's selection of this forum "should carry little weight because no operative facts occurred in this forum."  *See* Doc. No. 25 at 32.  QR Spex counters that this Court should refuse to disturb its choice given the many cases which find that a plaintiff's choice-of-forum weighs against transfer.  *See* Doc. No. 29 at 37-38.  In light of the general deference to a plaintiff's choice-of-forum, the Court is not persuaded that this factor favors transfer. However, QR Spex's choice of forum is not the only consideration and the Court can only determine whether to transfer this case under 28 U.S.C. § 1404 after weighing this factor with all of the other private and public convenience factors.  *See In re Horshoe*, 337 F.3d at 434 (holding that the "plaintiff's choice is clearly a factor to be considered but in and of itself it is neither conclusive nor determinative").

### *(b) Ease of Access to the Sources of Proof*

The second factor to consider is whether the location and ease of access to sources of proof favors the Central District of California over this district.  While this Court finds the access to sources of proof important, *see Z-Tel*, 331 F. Supp. 2d at 576, it finds Defendants' arguments insufficient to meet their burden in showing that transfer is appropriate.  The Defendants argue that

the parties' headquarters and principal places of business are located outside of Texas. However, that fact alone does not necessitate transfer and does not demonstrate why this district is inconvenient relative to the Central District of California. Defendants' other argument addresses the convenience of party witnesses; however, the Court considers witness convenience as a separate factor. As a result, the Court finds that this factor is neutral and does not favor transfer.

### (c) Witness Convenience

The Court must also consider the so called witness-convenience factor. *See Z-Tel Commc'ns*, 331 F. Supp. 3d at 573. Citing the *Z-Tel* decision, QR Spex notes that it is the convenience of the non-party witnesses that is "the more important factor and is accorded greater weight in a transfer of venue analysis." *See* Doc. No. 29 at 38 (quoting *Z-Tel Commc'ns*, 331 F. Supp. 2d at 573). Thus, QR Spex argues that for the many witnesses in this case, the Eastern District of Texas is no less convenient than the Central District of California. *See* Doc. No. 29 at 39. For example, QR Spex notes that most, if not all, of Oakley's non-party witnesses live more than 300 miles from the Central District of California. Given that those witnesses will therefore most likely travel by air to either forum, QR Spex asserts that the California court is no more convenient than this Court. Likewise, it points out that each and every one of Motorola's witnesses resides outside of California, making Texas just as convenient as the Central District of California. *See* Doc. No. 29 at 39. However, QR Spex overlooks two points. First, none of the non-party witnesses are residents of Texas. This fact means that even if this forum is as convenient as California, it is certainly not more convenient for non-party witnesses. Second, QR Spex seems to assume that the convenience of party witnesses drops from the picture under the *Z-Tel* decision. *See generally* Doc. No. 29 at 39-40. While the convenience of non-party witnesses is the most important consideration in analyzing a motion to

transfer venue, the Court points out that it should still consider the convenience of party witnesses. In this case, at least eight employees of Oakley who will likely testify are also citizens of California. While not dispositive, the burden of this forum on those party witnesses should be at least considered. As a result, the Court finds that the witness-convenience factor weighs in favor of transfer—especially in light of the fact that Oakley and ODI are not subject to this Court's jurisdiction in this case.

### (d) Place of the Alleged Wrong

The Court finds that this factor carries substantial weight in this particular case. After this suit was filed, Oakley, ODI, and OSC have effectively severed ties with Texas in relation to the O Rokr. For example, Oakley does not sell, and never has sold any O Rokrs in Texas. *See, e.g.*, Doc. No. 25, ex. C at 8. The oakley.com website makes clear that O Rokrs are not available for sale to Texas residents, and Oakley has required all third party retailers to place the same restrictions on their sales. Unlike so many other cases where a transfer of venue is inappropriate, *see, e.g., Visto v. Microsoft*, 2-05-cv-546 (E.D. Tex 2007);*Z-Tel Commc'ns*, 331 F. Supp. 2d at 579 (E.D. Tex. 2004), this case does not involve any on going alleged wrong in Texas. Doc. No. 25, ex. C. Furthermore, while potential customers were able to place pre-orders for the O Rokr, and while there was a short period when Texas residents were not precluded from pre-ordering an O Rokr, the evidence shows that no Texas resident ever placed a pre-order for the O Rokr. In short, the Court is aware of no evidence that any infringing acts have occurred in the Eastern District of Texas since immediately after this suit was filed. As a result, this factor weighs heavily in favor of transfer to the Central District of California because virtually no alleged wrongdoing occurred in Texas.

*(e) Possibility of Delay and Prejudice if Transfer is Granted*

The Court recognizes that delay and prejudice associated with transfer is only relevant "in rare and special circumstances" and only if "such circumstances are established by clear and convincing evidence." *See In re Horseshoe*, 337 F.3d at 434. Here, the parties have not presented the Court with any reason to believe that this case is such a rare circumstance where the Court should consider potential delay and prejudice. As a result, the Court finds this factor neutral.

Notwithstanding, the Court finds that the private interest factors, as a whole, weigh in favor of transfer. This finding stems primarily from the fact that no alleged wrong doing occurred in this forum. Given that none of the other factors weigh against transfer, the Court finds that the Defendants have met their burden in showing that the private interest factors favor transfer.

**(2) Public Interest Factors**

*(a)    Backlog and Other Administrative Difficulties*

Defendants have not presented the Court with substantial evidence under this factor showing that the Central District of California is necessarily more convenient. Defendants merely argue that "QR Spex admitted that the Central District of California is a convenient forum when it sued Motorola in the Central District of California [in other unrelated actions]." *See* Doc. No. 25 at 34. Therefore, the Court finds that this factor does not weigh in favor of transfer.

*(b)    The Fairness of Placing the Burdens of Jury Duty on the Citizens of the State with the Greater Interest in the Dispute*

As noted above, there is extensive evidence that no promotion, offer for sale, or actual sales of the O Rokr have occurred in the Eastern District of Texas. Furthermore, there is no evidence that any residents of this district own or use the O Rokr. By contrast, Oakley and Motorola developed

25

the O Rokr in the Central District of California.  Furthermore, although Oakley, ODI, and OSC are incorporated in the state of Washington, they all maintain their principal place of business in Foothill Ranch, California.  *See* Doc. No. 18 at ¶¶3-5.  Given the complete lack of allegedly infringing acts in this forum, the Court finds that it would be improper to find that it is fair to place the burdens of jury duty on the citizens of this district instead of those in the Central District of California.  The Court finds this is especially true here because Oakley and ODI, who are both central to the alleged infringement, are not subject to the Court's jurisdiction.  As a result, the Court finds that this factor weighs in favor of transfer.

### (c) Local Interest in Adjudicating Local Disputes

Likewise, there is little reason for adjudicating this dispute in Texas.  The Court has made clear the lack of allegedly infringing acts in Texas and in this District.  The engineering samples of the O Rokr which were sent to Texas were removed shortly after this suit was filed.  Doc. No. 31, ex C at ¶7.  In addition, there is ostensibly only one engineering sample that entered this district—the sample sent to the Frisco, Texas O Store.  Since the time that these O Rokrs were removed from Texas, the Defendants have ensured that Texas residents did not purchase the O Rokr, even via the internet.  Doc. No. 25, ex. C at ¶8.  As a result, the Court finds that the local interest in adjudicating this matter in the Eastern District of Texas is nominal at best.  This factor favors transfer.

### (d) Conflict of Laws

The final public interest factor involves the appropriateness of having the case in a jurisdiction in light of any potential problems in conflicts of laws.  It is unlikely that any conflict of law difficulties will arise in the case given the statutory nature of patent litigation.  Also, the Federal Circuit will review any substantive issues arising in this case, regardless of which district court hears

the case.  In this respect this District will be no different from any other federal district court.  As a result, the Court finds this factor bears little weight in analyzing whether to transfer the case.

Notwithstanding, the Court finds that the public and private interest factors favor transfer.  While several of the factors neither favor nor discourage transfer, the Court finds that Defendants have met their burden in showing that the substantial absence of infringing acts in the Eastern District of Texas clearly favors transfer of this case to the Central District of California.  Furthermore, proceeding with this case without Oakley and ODI would hinder judicial economy and would risk wasting judicial resources.  As a result, the Court hereby GRANTS Defendants' Motion to Transfer Venue as to OSC and Motorola.

### (IV)  Severance

At the present time, QR Spex has failed to serve Xonix Corporation (hereafter "Xonix").  As a result, the Court hereby severs this action with respect to Xonix in order to effectuate transfer of this case.  In this respect, Defendants' Motion is GRANTED.  When the clerk opens the new case the filing fee is hereby WAIVED.

### (V) Conclusion

In light of the foregoing, the Court ORDERS that

Oakley, Inc. and Oakley Direct, Inc. be DISMISSED WITHOUT PREJUDICE for lack of personal jurisdiction;

27

Defendants' Joint Motion to Transfer Venue is GRANTED as to OSC and Motorola;

Defendants' Joint Motion to Sever Xonix Corp. is GRANTED.

It is so ORDERED.

**SIGNED this 18th day of June, 2007.**

_____
DAVID FOLSOM
UNITED STATES DISTRICT JUDGE